John Roscoe GARLAND, Appellant,

v.

COMMONWEALTH of Kentucky,
Appellee.

No. 1999–SC–0259–MR.

Supreme Court of Kentucky.

Oct. 23, 2003.

As Modified on Denial of Rehearing
Feb. 19, 2004.

As Corrected March 18, 2004.

Donna L. Boyce, Julie Namkin, Assistant Public Advocates, Frankfort, Counsel for Appellant.

A.B. Chandler III, Attorney General of Kentucky, Elizabeth A. Heilman, Louis F. Mathis, Assistant Attorneys General, Criminal Appellate Division, Frankfort, Counsel for Appellee.

Opinion of the Court by Chief Justice LAMBERT.

Appellant, John Roscoe Garland, was convicted by a McCreary Circuit Court jury of three counts of murder and sentenced to death for each count. He appeals to this Court as a matter of right pursuant to Section 110(2)(b) of the Constitution of Kentucky.

On the night of Saturday, March 9, 1997, 26-year-old Jean Ferrier, 22-year-old Crystal Conaster, and 16-year-old April Sexton left McCreary County and went to a country music dance hall in Somerset as they did almost every Friday and Saturday night. Jean had been in a relationship with the then 54-year-old Appellant, and

was currently dating Gary Roberts. Appellant's voice on an audiotape discovered after the murders stated his belief that Jean was pregnant, and that Roberts was the father. Appellant's son, Roscoe, testified at trial that about a month before the murders, his father had said he was going to kill Jean.

At the dance in Somerset that night, Jean, Crystal and April circled the parking lot because Jean was afraid Appellant would be there. While there, they met Chris Boswell, who danced with Crystal and rode home with the women after the dance. On the way home, the friends dropped off April at about 12:30 or 1:00 a.m., then drove to Gary Roberts' driveway and honked, then drove to Jean's trailer. On Sunday afternoon, the bodies of Jean, Crystal, and Chris were found in a bedroom of Jean's trailer. They had been shot to death. Jean had also been choked prior to her death.

Roscoe, the star witness against his father, testified that on the night of the murders, he and his father were going to the London Auto Auction. Due to a traffic jam, they changed plans and instead followed Jean's vehicle to her trailer. Appellant went inside, and Roscoe heard arguing. Roscoe went inside, where both Jean and his father and the interior of the dwelling appeared to be disheveled from a fight. Chris came out of the bedroom, and Appellant shot him. Appellant then shot Crystal, then shot Chris again, and then shot Crystal again. He then shot Jean.

Appellant instructed Roscoe to put the gun in a bag and hide it. The next day, Appellant told Roscoe to procure a similar gun, as everyone knew Appellant carried a gun. Appellant gave Roscoe's girlfriend money, with which she purchased another .357 magnum from Clayton Stephens.

Appellant denied committing the murders, and claimed that Roscoe was lying. He claimed that the murder weapon did not belong to him, but to Roscoe. Appellant informed officers that he had spent the fateful night with Roscoe, yet later maintained that he had gone to London to visit his ex-wife, Eula Isgrigg. Eula first's story was that she had not seen Appellant for some time before the murders, but that he had come to her home the Monday afterwards. Later, she changed her story and said that he had come to her home at about 2:00 a.m. Sunday morning. She claimed that she had first lied because she was scared.

More facts will be presented as needed to analyze Appellant's thirty-nine claims of error.

■ Appellant's first claim is that the trial court erred by failing to instruct the jury on the lesser-included offense of first-degree manslaughter. Defense counsel did not request this instruction, and thus the alleged error is not preserved for appellate review. In death penalty cases, however, there is an exception to the contemporaneous objection rule.[1] The standard of review for an unpreserved error in such cases is as follows:

> Assuming that the error … occurred, we begin by inquiring: (1) whether there is a reasonable justification or explanation for defense counsel's failure to object, e.g., whether the failure might have been a legitimate trial tactic; and (2) if there is no reasonable explanation, whether the unpreserved error was prejudicial, i.e., whether the circumstances in totality are persuasive that, minus the error, the defendant may not have been found guilty of a capital

1. *Foley v. Commonwealth,* Ky., 953 S.W.2d 924, 928 (1997).

crime, or the death penalty may not have been imposed.[2]

We shall consider the claimed error as well as any other unpreserved errors according to the foregoing standard.

▇▇▇ Appellant contends that he was entitled to a first-degree manslaughter instruction[3] because the prosecution presented evidence of extreme emotional disturbance ("EED").[4] A possible interpretation of the prosecution's evidence[5] suggests that the end of the relationship with Jean could have triggered an emotional disturbance that continued uninterrupted until the murders.[6] According to the evidence, Appellant had been upset since Jean terminated the relationship, started seeing Gary Roberts, and led Appellant to believe she was pregnant with Roberts' child. A month before the murders, Appellant told Roscoe he was going to kill Jean. A week before the murders, he fired shots in the direction of Jean's trailer. The afternoon prior to that fateful Saturday night, he fired shots into the ground near Jean's trailer. Appellant ultimately killed Jean and the other two victims later that night when a half-dressed Chris Boswell walked out of her trailer bedroom. This evidence, however, also suggests that Appellant's anger was sporadic after the break-up, erupting at times and receding at others, and thus not continuous as required for an EED instruction. Appellant might have argued that the sight of Chris Boswell exiting the bedroom of Jean's trailer was the triggering event, yet this arguments lack force because Chris was with Crystal, and Appellant's agitation started long before this event.

Appellant, however, might have had legitimate reasons for failing to present this EED theory and failing to request a supporting instruction. Appellant presented an alibi defense. His side of the story was that he did not commit the murders. He testified that he was not at Jean's trailer at the time of the killings, and that he had no motive for killing the victims. He claimed that it was his son, Roscoe, not he, who was lying. This testimony indicates that he was seeking complete exoneration. It would not have been unreasonable to pursue this "all or nothing" strategy rather than to permit a possible compromise verdict.[7] With a steadfast denial of guilt, defense counsel could focus on the weaknesses in the prosecution's case, such as Roscoe's possibly self-serving testimony, and try to establish reasonable doubt suffi-

**2.** *Sanders v. Commonwealth,* Ky., 801 S.W.2d 665, 668 (1990).

**3.** KRS 507.030(1)(b).

**4.** "Extreme emotional disturbance is a temporary state of mind so enraged, inflamed, or disturbed as to overcome one's judgment, and to cause one to act uncontrollably from the impelling force of the extreme emotional disturbance rather than from evil or malicious purposes." *McClellan v. Commonwealth,* Ky., 715 S.W.2d 464, 468–69 (1986).

**5.** *See Reed v. Commonwealth,* Ky., 738 S.W.2d 818, 822–23 (1987)("It is irrelevant that the evidence from the parties does not indicate the need for a particular instruction. The determination of what issues to submit to the jury should be based upon the totality of the evidence"); 1 Cooper, *Kentucky Instructions to Juries* (Criminal) § 1.05 (3rd ed. 1993)("An instruction on a lesser included offense may be authorized even if inconsistent with the defendant's theory of the case, *e.g.*, if it is supported by the Commonwealth's evidence").

**6.** *Spears v. Commonwealth,* Ky., 30 S.W.3d 152, 155 (2000).

**7.** *See, e.g., McKinney v. Commonwealth,* Ky., 60 S.W.3d 499, 507 (2001)(defense counsel stated during discussion of instructions that "it was trial strategy to waive instructions on a lesser offense" of intentional murder).

cient for an outright acquittal. The pursuit of an EED theory would have tended to cast doubt on a claim of innocence. Thus, we cannot say that there was not trial strategy in defense counsel's failure to request the EED instruction, and reversal is not warranted.

Appellant's second claim is that the trial court improperly excused juror Stephanie Capps for cause. During voir dire, the juror initially stated that she didn't believe in the death penalty, and that she didn't think she could consider imposing the death penalty. The prosecutor asked her if this was based upon her "personal beliefs and convictions," and she replied affirmatively. Upon further questioning as to whether there might ever be facts "so horrible" as to make her "go against her normal feelings," she stated,

> I don't know. I don't know—I think that them having to sit and suffer and live with what they done should be enough punishment for them.

The prosecutor continued this line of questioning, asking three more questions, two of which referred to "really horrible cases," until the juror conceded, "Yeah, I guess I could." The trial court excused her as unqualified.

■ Jurors may not be disqualified simply because they express some disagreement with the death penalty.[8] Even a venire person who initially provides a disqualifying response should not be excused if further examination shows her to be qualified.[9] An appellate court should apply an abuse of discretion standard in its review of a trial court's decision to excuse a juror for cause.[10] In this case, the juror's initial opposition to the death penalty was reinforced throughout questioning. Although the juror eventually conceded, the trial court was in the best position to assess this not wholly unambivalent concession in light of the juror's demeanor and literal answers. Given Capps' continued opposition and ambivalence, the trial court did not abuse its discretion in dismissing her for cause.

■ Appellant's third claim of error, which is not preserved, is that the trial court erred by failing to include a life without parole ("LWOP") instruction in the penalty phase. The LWOP penalty was in effect at the time of trial but not at the time of the crimes.[11] In *Commonwealth v. Phon*,[12] this Court held that LWOP was a mitigating penalty and could therefore be applied retroactively to capital crimes pursuant to KRS 446.110 with the unqualified consent of the defendant.[13] The defendant's consent serves as a waiver of any claim of an *ex post facto* violation. Garland points out that this case is distinguishable from *Phon* because he was never given the opportunity to consent to the inclusion of LWOP in the sentencing range. However, absent a defendant's express consent, the penalty is not authorized, and thus Appellant's claim must fail.[14]

Appellant's fourth claim, which is not preserved, is that the trial court violated

---

8. *Gray v. Mississippi*, 481 U.S. 648, 658, 107 S.Ct. 2045, 95 L.Ed.2d 622 (1987).

9. *Id.* at 662–63, 107 S.Ct. 2045.

10. *Foley v. Commonwealth*, Ky., 953 S.W.2d 924, 931 (1997).

11. Garland's trial began on January 4, 1999. KRS 532.030(1), which authorizes LWOP, went into effect approximately six months earlier, on July 15, 1998. The offenses were committed on March 9, 1997.

12. Ky., 17 S.W.3d 106 (2000).

13. *Id.* at 108.

14. *Lawson v. Commonwealth*, Ky., 53 S.W.3d 534, 550–51 (2001).

RCr 9.74, which requires that any information given to the jury after it has retired for deliberation be in open court in the presence of the jury, the defendant, and counsel (or after reasonable notice to counsel and the parties). In this case, after the jury had been deliberating for about two hours during the penalty phase, the jury gave the bailiff a note requesting answers to five questions. The juror who handed the note to the bailiff stated that the jury did not want to be brought back into the courtroom. After reviewing the questions with counsel, the judge determined that none of the questions could properly be addressed and wrote on the note, "Can't answer, just follow the instructions." Later, the jury sent another note to the judge asking whether the verdict had to be unanimous, and the judge sent back a note answering affirmatively.

 Appellant maintains that the record does not reflect whether he was present during these interactions, and thus he contends he was denied his right to be present during the sentencing determination. This Court has stated, "Long ago, we joined the trend away from a strict or technical application of the rules forbidding conversations with or among jurors."[15] This Court has further stated, "The true test is whether the misconduct has prejudiced the defendant to the extent that he has not received a fair trial."[16] In this case, there is no indication that Garland was denied his right to be present, and this claim of error is entirely speculative. Moreover, Appellant fails to allege

what prejudice, if any, he suffered. Given the recorded presence and participation of defense counsel, there was no error.

 Appellant's fifth claim of error, related to the previous claim, alleges that the trial court should have answered the jury's five questions. These questions were:

1) Can they be run concurrently and/or one after the other?; 2) With life without parole, will he ever get out of jail?; 3) With death, how long would it be before he would be put to death?; 4) How many times can he appeal this case?; and 5) Is there anyway we can keep him in jail until death, without the death penalty?

Appellant contends that the second question (which was crossed out by the jury) and fifth question reveal that the jury wanted to recommend a sentence that would keep him in prison for the rest of his life yet not condemn him to death. Appellant further argues that by not providing information as well as the LWOP sentencing alternative, the trial court impermissibly diminished the reliability of the jury's determination that death was the appropriate punishment. This claim of error is not preserved.

KRS 532.055(2)(a) allows a jury to hear information about parole eligibility.[17] However, in *Perdue v. Commonwealth*,[18] this Court held that although parole eligibility information is fully admissible in a truth-in-sentencing hearing, it has no place in a death penalty hearing.[19] Accordingly, there was no error.

15. *Johnson v. Commonwealth*, Ky., 12 S.W.3d 258, 266–67 (1999).

16. *Cosby v. Commonwealth*, Ky., 451 S.W.2d 653 (1970).

17. *See Offutt v. Commonwealth*, Ky., 799 S.W.2d 815, 817 (1990); *Commonwealth v. Reneer*, Ky., 734 S.W.2d 794, 797 (1987).

18. Ky., 916 S.W.2d 148 (1996).

19. *Id.* at 164; *Francis v. Commonwealth*, Ky., 752 S.W.2d 309 (1988).

Appellant's sixth claim is that there was an improper change of venue. This issue was not preserved for appellate review. Appellant's case was originally scheduled for trial in McCreary Circuit Court. After the prosecution and defense announced ready, the trial court questioned the fifty-nine prospective jurors generally, after which there were approximately sixteen left who were qualified to serve on the jury.

The prosecutor then moved for a change of venue, stating, "the Commonwealth believes that it would be virtually impossible to get a fair and impartial jury empanelled here in this county." Defense counsel replied, "Judge, in response to that, at this time, in all frankness and honesty, we believe [the prosecutor] is probably correct. I think in all honesty we probably would not be able to seat a jury."

 A change of venue is proper when public opinion is so aroused as to preclude a fair trial.[20] For a change of venue, "there must be a showing that: (1) There has been prejudicial news coverage; (2) It occurred prior to trial; (3) The effect of such news coverage is reasonably likely to prevent a fair trial."[21] The questions and answers in this case reveal that many of the jurors had heard of the case and had formed an opinion about it. Moreover, the prosecution and defense agreed that it would probably be impossible to seat a fair and impartial jury in McCreary County. Thus, there was no error.

 Appellant's seventh claim is that the trial court improperly admitted hearsay evidence. The first instance of alleged improper hearsay came about

when the prosecutor asked Jeanette Musgrove, Jean's mother, if her daughter was scared of Appellant. Defense counsel objected on the grounds that the question called for an opinion of someone else's intentions. However, Ms. Musgrove answered "no" before the objection was overruled. Ms. Musgrove's testimony did not include hearsay, as she did not repeat an assertion by her daughter or any nonverbal conduct intended as an assertion.[22] Further, Ms. Musgrove was present the afternoon before the murders as Appellant fired shots at the ground when Jean came out of her trailer, and Ms. Musgrove observed her daughter's demeanor and reaction to this shooting incident and testified to these observations. This evidence was admissible pursuant to KRE 404(b)(1). Thus, there was no error.[23]

The second instance of alleged hearsay came about during the testimony of April Sexton, who had gone to the dance hall with victims Crystal and Jean on the night of the murders. Ms. Sexton testified that the three women circled the parking lot in their car upon arriving at the dance hall "because they was afraid that [Appellant] was going to be there." Ms. Sexton began to testify as to what Jean had said: "When we got up there, before we went in, Jean said she was going to circle-" and "she said she was afraid that-." Both times her testimony encroached upon inadmissible hearsay because she started to say what Jean had said, yet the first time defense counsel objected, and the second time the prosecutor stopped her.

 Under KRE 803(3), the state of mind exception, out of court statements

**20.** *Kordenbrock v. Commonwealth,* Ky., 700 S.W.2d 384 (1985).

**21.** *Wilson v. Commonwealth,* Ky., 836 S.W.2d 872, 878 (1992), *overruled on other grounds by St. Clair v. Roark,* 10 S.W.3d 482 (1999).

**22.** KRE 801.

**23.** *Partin v. Commonwealth,* Ky., 918 S.W.2d 219 (1996).

of fear may be admissible. However, the statement of fear must satisfy the rule of relevancy.[24] Generally, when a victim's state of mind is not at issue, the hearsay testimony is not admissible.[25] Although Jean's state of mind was not at issue, there was some probative value to the testimony as "[i]t is not unreasonable to ask in such circumstances why she would have such fear and whether it tended to render a disputed fact more or less likely."[26] Thus, the testimony was neither unnecessary nor unreasonable and thus permissible under KRE 401 and KRE 403. Moreover, the disputed testimony was brief and it was interrupted by counsel and the court. While the probative value may have been limited, so, too, was the prejudicial effect, and in such circumstances, we discern no abuse of trial court discretion.

■ Appellant also contends that improper "investigative hearsay" was admitted.[27] During retired KSP Detective McKinney's testimony, he stated that he had gained information and a tip about a pistol purchased by Appellant's son on the day of the murders from Clayton Stephens. Defense counsel's objection was overruled upon the prosecutor's belief that Stephens was there to testify. Detective McKinney then stated that Clayton Stephens confirmed that he had sold Roscoe a .357 Magnum Smith and Wesson pistol around noon that day. Although technically hearsay, Stephens later testified and was thus subject to cross-examination regarding the statements. Thus the error

"was erased by subsequent legitimation of the incompetent testimony."[28]

■ Detective McKinney also stated that lab technician Chuck Lanham told him that the bullets taken from the victims were not fired from the weapon purchased from Clayton Stephens. Defense counsel objected upon grounds of redundancy, i.e., that Detective McKinney had already said that he did not know if it was the same gun. The objection was overruled. Technician Lanham never testified, as a recent lung transplant had prevented his further work on the case and "firearm and tool mark" examiner Dwight Deskins took over the case, reviewed and completely reworked it, and testified as an expert witness at trial. Thus, although McKinney's statement was hearsay, it was not prejudicial as the scientific evidence upon which it was based was admitted through Deskins' testimony, which was subject to cross-examination by Appellant.

Appellant's eighth claim is that prior bad acts were improperly admitted without prior notice pursuant to KRE 404(c).[29] Approximately three months after the indictment, defense counsel moved that the prosecution disclose all of Appellant's prior bad acts and thereafter moved that no prior bad acts be admitted because no KRE 404(c) notice had been provided. The trial court granted the motion. Appellant now contends that two prior shooting episodes were admitted despite the trial court's order prohibiting the admission of KRE 404(b) evidence. The first

**24.** *Bray v. Commonwealth,* Ky., 68 S.W.3d 375, 381 (2002).

**25.** *Partin,* 918 S.W.2d at 222.

**26.** *Id.* at 223.

**27.** *Sanborn v. Commonwealth,* Ky., 754 S.W.2d 534 (1988).

**28.** *Summitt v. Commonwealth,* Ky., 550 S.W.2d 548, 550 (1977).

**29.** *See Gray v. Commonwealth,* Ky., 843 S.W.2d 895, 897 (1992)(fundamental fairness dictates that defendant is entitled to be informed of evidence of other criminal activity the prosecution introduce so far in advance of trial as to permit a reasonable time for investigation and preparation).

alleged shooting was mentioned during Jeanette Musgrove's testimony. Therein, Ms. Musgrove stated that on the day of the crimes, her daughter Jean went into her house to get some clothes for her children, and Appellant "was shooting at [Jean]." Appellant lived just up the hill from Jean. The second alleged bad act was admitted during Gary Robert's testimony, when he stated that the weekend before the murders he had gone to a dance with Jean and upon return to her home shots were fired from Appellant's house. Although defense counsel objected, it was upon grounds that Roberts was not qualified to say from which direction the shots came.

We are faced with the question of whether a general ruling prior to trial sufficiently preserves an issue when there is no contemporaneous objection to specific evidence at trial. In *Tucker v. Commonwealth*,[30] this Court considered a similar situation in which the defendant had filed a pretrial motion to prohibit evidence of a previous robbery that implicated him in the robbery for which he was currently on trial. The trial court allowed the evidence to be presented at trial, and during trial there was no contemporaneous objection. In considering the issue of preservation, we stated,

> While this Court has approved the use of motion *in limine* as a means of obtaining pretrial rulings concerning the admission and exclusion of evidence, we have not repealed the contemporaneous objection rule. One claiming error may not rely on a broad ruling and thereafter fail to object specifically to the matter

complained of. When trial counsel is aware of an issue and fails to request appropriate relief on a timely basis, the matter will not be considered plain error for reversal on appeal.[31]

This principle is supported by *Skinner v. Commonwealth*,[32] in which defense counsel moved for a mistrial following admission at trial of statements excluded in pre-trial rulings.[33] In the instant case, despite the pretrial ruling prohibiting KRE 404(b) evidence generally, Appellant failed to alert the trial court specifically to his complaint regarding the two shootings as prior bad acts prohibited by the pre-trial ruling. Although KRE 103(d) states that a trial court's order on a motion *in limine* preserves error for appellate review, *Tucker* suggests that the alleged KRE 404(c) notice violation should be reviewed only for palpable error.

The admission of these two recent, previous shooting episodes was proper under KRE 404(b)(1), which allows admission of prior bad acts if "offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Appellant's defense was that he did not murder the victims. The two prior shootings tend to show that he intended to kill Jean, thus undermining his defense. Thus, there was no error, and reversal is not required.

Appellant's ninth claim, also not preserved, is that improper "demeanor evidence" was admitted. KSP Detective McKinney interviewed Appellant shortly after the bodies were discovered. Detective McKinney testified at trial regarding

**30.** Ky., 916 S.W.2d 181 (1996).

**31.** *Id.* at 183 (*citing, Crane v. Commonwealth*, Ky., 833 S.W.2d 813 (1992), *West v. Commonwealth*, Ky., 780 S.W.2d 600 (1989)).

**32.** Ky., 864 S.W.2d 290, 297–98 (1993).

**33.** *See also, Daniel v. Commonwealth*, Ky., 905 S.W.2d 76 (1995)(contemporaneous objection to testimony of prior bad acts admitted without KRE 404(c) notice).

this conversation, stating that Appellant "was very calm and collective [sic]. Didn't seem to be worried about anything." When the prosecutor then asked if Appellant showed any emotion, the detective said, "No, he didn't."

◼◼◼◼ Appellant contends that this statement constituted an improper lay opinion of guilt prohibited by KRE 701, and is also an inadmissible comment on Appellant's silence.[34] It is settled law in Kentucky that evidence regarding the accused's demeanor, appearance, and behavior during the period of time that he committed the crime and shortly thereafter is relevant evidence in the determination of guilt.[35] Appellant's contention regarding the detective's testimony as commentary on silence is without merit, as Appellant spoke and was not silent, and there was no commentary on silence.

Appellant's tenth claim, also not preserved, is that the prosecution improperly introduced testimony that Jean was pregnant by a man other than Appellant. At trial, the prosecution played an audiocassette made about a month before the murders and found in Jean's home after her death. On the tape, Appellant stated that Jean was pregnant and that he loved the baby even though Gary Roberts was the father. Gary Roberts later testified that he had dated Jean for the four or five months preceding her death, and that she was a month pregnant with his baby at that time. An autopsy report, however, concluded that Jean was not pregnant at the time of her death.

◼◼ Appellant contends that the prosecutor knowingly presented false evidence against Appellant, i.e., that Jean was pregnant. However, the relevant factor is not whether or not Jean was pregnant, but Appellant's belief regarding her pregnancy and its possible influence on his behavior. The audio cassette of Appellant's voice reveals his belief that Jean was pregnant and that the father was Gary Roberts. As this evidence goes to Appellant's state of mind and his motive for killing Jean, it was relevant under KRE 401 and there was no error.

◼◼ Appellant's eleventh claim, also not preserved, is that the prosecutor made numerous improper comments during opening statement, closing argument, and the penalty phase closing argument. Specifically, the prosecutor referred to something that looked to Detective McKinney like a bloody footprint on Jean's panties after she was killed, and argued that Appellant had kicked her on the night of her murder. The prosecutor also made comments about the death penalty, for example, about how "this country, our forefathers, our ancestors have always believed that under certain circumstances the death penalty was an appropriate penalty . . . because our society values life, and puts a very high priority on the sanctity of life." It is settled law that "so long as counsel kept with the record, and discussed the testimony in the case, and drew legitimate inference from proven facts and circumstances, he was within his rights."[36] Opening and closing statements are not

**34.** *Niemeyer v. Commonwealth,* Ky., 533 S.W.2d 218 (1976), *overruled on other grounds by Blake v. Commonwealth,* 646 S.W.2d 718 (1983).

**35.** *Mills v. Commonwealth,* Ky., 996 S.W.2d 473 (1999); *Bevins v. Commonwealth,* Ky., 712 S.W.2d 932, 938 (1986). *But see McKin-*

*ney v. Commonwealth,* Ky., 60 S.W.3d 499, 504 (2001) (this Court reverses for failure of the trial court to allow testimony that would have explained why the defendant did not react as would be expected.)

**36.** *Lake v. Commonwealth,* Ky., 209 Ky. 832, 273 S.W. 511, 514 (1925).

evidence, and counsel is allowed wide latitude during both.[37]

■ Appellant's twelfth claim is that the prosecution improperly failed to reveal details of a deal with co-indictee Roscoe. In fact, on defense cross-examination, Roscoe denied any deal, but revealed his hope of lenient treatment in exchange for his cooperation. As Appellant and defense counsel were furnished with a copy of the indictment at the arraignment, and as Roscoe testified at trial regarding his understanding with the prosecution, Appellant's claim fails.

■ Appellant's thirteenth claim is that the trial court improperly refused to allow his ex-wife, Eula Baker Garland Isgrigg, to impeach Roscoe's credibility. Ms. Isgrigg testified on avowal that Roscoe, as far as she knew, never told the truth and that he lies to her all the time. KRE 608 (as it was at the time of this trial) allows opinion evidence of character only as to "general reputation in the community." As Ms. Isgrigg's avowal testimony went to her individual experience with Roscoe rather than his general reputation in the community, as required by KRE 608, there was no error.

■ Appellant's fourteenth claim, which is not preserved, is that the penalty phase instructions prevented reliable capital sentencing. In support of this contention, he describes twelve separate alleged improprieties in the penalty phase instructions. He first maintains that the trial court erroneously failed to instruct the jury on the EED statutory mitigator pursuant to KRS 532.025(2)(b)(2).[38] This mitigating factor may be considered even

though the evidence of EED is insufficient to constitute a defense to the crime. Although not mentioning EED *per se*, the instructions allowed in mitigation that:

> This crime was impulsive based upon instant passion. The Defendant was in love with the victim, Willa Jean Ferrier, and acted in an instance of crazed jealousy.

As Appellant acquiesced in this more traditional phrasing of the EED mitigator, there was no error.

■ Appellant further contends that the jury instructions erroneously failed to advise that the finding of an aggravating factor and the fixing of a sentence must be unanimous. We have examined the instructions and indeed the requirement of a unanimous verdict does not appear expressly therein. However, during penalty phase deliberations, the jury inquired as to whether its verdict had to be unanimous and the trial court answered affirmatively.[39] Moreover, the instructions reaffirmed the continued applicability of reasonable doubt with respect to the sentencing process, and upon post-penalty phase verdict polling, each juror, by his or her answers, established that the verdict was unanimous. While the requirement of unanimity should have been explicit, in view of the foregoing, there was no reversible error. Appellant's remaining complaints about penalty phase instructions do not warrant reversal.

Appellant's fifteenth claim, that the trial court decided the sentence prematurely, is patently without merit. Appellant's sixteenth claim, that the pre-sentencing re-

---

37. *Stopher v. Commonwealth*, 57 S.W.3d 787, 805–806 (2001); *Slaughter v. Commonwealth*, Ky., 744 S.W.2d 407 (1987).

38. *See Hunter v. Commonwealth*, Ky., 869 S.W.2d 719, 725–26 (1994); *Smith v. Com-*

*monwealth*, Ky., 845 S.W.2d 534, 539–40 (1993); *Bevins v. Commonwealth*, Ky., 712 S.W.2d 932 (1986).

39. See Issue 4, *supra*.

port was intentionally withheld from him, is likewise without merit.

■ Appellant's seventeenth claim, which is not preserved, is that the prosecutor improperly questioned the jurors during individual voir dire regarding the range of penalties. Specifically, Appellant complains that the prosecutor did not tell the jurors that they "must find the existence of an aggravating circumstance beyond a reasonable doubt before ... [fixing] the defendant's sentence at death, life imprisonment without the benefit of probation or parole, or life imprisonment without benefit of probation or parole for twenty-five (25) years." As defense counsel had the opportunity to question the jurors regarding aggravating factors and reasonable doubt but did not, and as there is no authority requiring the prosecutor to do so, Appellant's claim must fail.

■ Appellant's eighteenth claim is that the trial court erred by denying his request for state-appointed co-counsel when his private attorney took over the case from his two Department of Public Advocacy attorneys. As Kentucky does not require a defendant to have two counsel for capital cases, and as a defendant has the constitutional right to be represented by an attorney of his choosing,[40] there was no error.

■ Appellant's nineteenth claim is that the trial court erred by admitting photos and videos of the crime scene, as well as autopsy reports, because they were redundant, unnecessary, and highly prejudicial. It is the general rule, however, "that relevant pictures are not rendered inadmissible because they are gruesome and the crime heinous."[41] Crime photos are generally admissible unless "the condition of the body has been materially altered by mutilation, autopsy, decomposition, or other extraneous causes, not related to the commission of the crime, so that the pictures tend to arouse passion and appall the viewer."[42] As the photographic images here involved no extraneous mutilation unrelated to the crimes, there was no error.

■ Appellant's twentieth claim is that testimony that he had taken a polygraph test was erroneously admitted. This information was revealed during the testimony of defense witness Starling Douglas, Appellant's brother-in-law, who stated that Appellant had come to visit him three or four days after the murders "right after he had come from London from having polygraph tests done." Ms. Isgrigg, Appellant's ex-wife, also testified that Appellant came to her sister's house on the Monday after the murders "[w]hen he had to go for a polygraph test." Although polygraph evidence is inadmissible,[43] in this case the inadvertent references came from defense witnesses upon examination by defense counsel. After the second mention of "polygraph," the Commonwealth objected, and the trial court admonished the witness not to say "polygraph." As the mere utterance of the word without a prejudicial inference as to the result is not grounds for reversal,[44] Appellant's claim must fail.

**40.** *Morton v. Commonwealth,* Ky., 817 S.W.2d 218, 220 (1991).

**41.** *Clark v. Commonwealth,* Ky., 833 S.W.2d 793, 794 (1991).

**42.** *Id.*

**43.** *Holland v. Commonwealth,* Ky., 703 S.W.2d 876, 879 (1985).

**44.** *Tamme v. Commonwealth,* Ky., 973 S.W.2d 13, 33 (1998); *McQueen v. Commonwealth,* Ky., 669 S.W.2d 519, 523 (1998).

■ Appellant's twenty-first claim is that a mistrial should have been granted due to a spectator outburst during voir dire. During individual voir dire of one prospective juror, he said that Appellant's son-in-law had been in court the previous day, expressing negative opinions about the case. The deputy then excluded the son-in-law from the courthouse for the remainder of the trial. The trial court excused this prospective juror and several others who claimed that they had heard the remarks of the son-in-law. The trial court's decision to excuse the affected jurors rather than declare a mistrial was within its discretion.[45]

■ Appellant's twenty-second claim is that the trial court improperly failed to swear in the jury prior to voir dire. The complained of conduct is that the trial court, without objection, initially asked in group voir dire if anyone knew the attorneys, if anyone had read about the case, or if anyone knew anything about the case that would affect their service as a juror. Thereafter, the clerk called the numbers of thirty-one prospective jurors who were administered the oath. All jurors who sat on Appellant's jury were administered the oath according to RCr 9.42, however, and thus there was no error.

■ Appellant's twenty-third claim is that the trial court failed to admonish the jury not to communicate about the case as required by RCr 9.70. As the trial court administered the oath to all potential jurors and again admonished the jury prior to individual voir dire, there was no error.

Appellant's twenty-fourth claim is that the court clerk rather than the trial judge or counsel exercised challenge for cause to the prospective jurors. We refuse to indulge the degree of imagination necessary to entertain this preposterous claim, which has no support in the record.

■ Appellant's twenty-fifth claim is that the indictment was legally insufficient, as it did not describe a culpable mental state along with the allegation that Appellant committed murder by shooting to death the three victims. The indictment, however, informed Appellant of the specific offenses with which he was charged and did not mislead him,[46] and there was no error.

■ Appellant's twenty-sixth claim is that he was improperly refused the opportunity to testify whether he knew of someone else who had a motive to kill Jean. As there was no avowal offered, there is no record sufficient for appellate review of this issue.[47]

Appellant's twenty-seventh claim is that he was denied his right to be present for five specific pre-trial hearings. This claim has no support in the record and will not be considered further.

Appellant's twenty-eighth claim is that the trial court improperly failed to hold a competency hearing after allegedly finding him incompetent. This issue is not preserved. The basis for this claim comes from a standardized questionnaire filled out by the trial judge after sentencing and submitted with the record on appeal to this Court pursuant to KRS 532.075(1). The report was first submitted to defense counsel, who acquiesced in the factual accuracy of the report. The issue herein arises because of question number 13(b), which

45. *Thompson v. Commonwealth*, Ky., 862 S.W.2d 871, 874 (1993).

46. *Wylie v. Commonwealth*, Ky., 556 S.W.2d 1 (1977).

47. *Commonwealth v. Ferrell*, Ky., 17 S.W.3d 520, 523 (2000); *Partin v. Commonwealth*, Ky., 918 S.W.2d 219 (1996).

comes under the heading "Psychiatric Evaluation Performed?" and asks, "If performed, is the defendant as a result of mental disease or defect, lacking the capacity to appreciate the nature and consequences of the proceedings against him/her or to participate rationally his his/her own defense?" Thereafter, the answer "Yes" is marked with a typewritten X.

Given the fact that competency was not considered to be at issue prior to or during the trial, it is unclear why this X is placed in the "Yes" box, and one is led to suspect typographical error. A confidential KCPC medical and neurological evaluation was performed upon request of defense counsel prior to trial, and the KCPC report indicates no support for the affirmative answer, and in fact offers statements to the contrary. The trial court never ordered a competency evaluation and nothing in the KCPC report places Appellant's competency in question. Accordingly, there was no competency evaluation required under KRS 504.100, and the mysterious X shall be treated as a nullity.

■■■ Appellant's twenty-ninth claim is that a directed verdict should have been granted because the absence of EED was not proven beyond a reasonable doubt. At trial, "once evidence is introduced to prove the presence of EED, its absence becomes an element of the offense of murder." [48] However, the prosecution "need not affirmatively disprove EED unless the evidence of EED is so overwhelming that it necessitates acquittal on the charge of murder." [49] As discussed in the first claim of error, Appellant may have been entitled to an instruction on EED. However, the evidence of EED was not so overwhelming

as to require acquittal, as it is questionable whether Appellant's emotional disturbance remained uninterrupted from the end of his relationship with Jean. Appellant's stated desire to kill Jean a month prior to the murders, and his random bouts of shooting, could support an argument either that the distress was continuous or sporadic. Accordingly, the prosecution was not required to disprove the absence of EED, which was not even presented as a defense theory.

■■■ Appellant's thirtieth claim, which is not preserved, is that the aggravator was not charged in the indictment. KRS 532.025(1) only requires written notice of aggravating circumstances prior to trial. The indictment satisfies the requirements of RCr 6.10, however, and thus there was no error.

■■■ The thirty-first and thirty-second claims of error, which are not preserved, are that there was improper use of mutually supporting aggravating factors. Although the aggravating factor was the same, the underlying facts differed as to each victim. [50] Thus there was no error.

■■■ The thirty-third claimed error, which is not preserved, is that "residual doubt bars the death sentence." Although, as Appellant points out, "a jury's verdict and the truth are not unerringly synonymous," the system by which juries decide the fate of those accused of crimes is deeply ingrained in this country. Moreover, Appellant provides no factual basis that would support his "residual doubt" claim, and this Court has specifically rejected "residual doubt" as a mitigating cir-

---

**48.** *Coffey v. Messer,* Ky., 945 S.W.2d 944 (1997).

**49.** *Spears v. Commonwealth,* Ky., 30 S.W.3d 152, 154 (2000).

**50.** *Tamme v. Commonwealth,* Ky., 973 S.W.2d 13 (1998); *Bowling v. Commonwealth,* Ky., 873 S.W.2d 175, 181 (1993).

cumstance.[51] Thus, reduction of his sentence to some form of life imprisonment is not warranted.

The thirty-fourth claim is that death qualification of jurors is unconstitutional. Both this Court and the United States Supreme Court have rejected this argument.[52]

Appellant's thirty-fifth claim, which is not preserved, is that Kentucky's proportionality review prescribed by KRS 532.075(3)(c) is unconstitutional. This Court has considered this issue in previous cases, and held otherwise.[53] Additionally, Appellant's right to a proportionality review is not constitutionally based rather it is statutory based purely on KRS 532.075.[54] Pursuant to the statute, we have reviewed Appellant's case and determined that the sentence of death was not imposed arbitrarily or under the influence of passion or prejudice. This Court particularly considered cases where the defendant received a death sentence for intentionally murdering multiple victims with no other criminal activities (i.e. robbery, burglary, etc.): *Wheeler v. Commonwealth*,[55] *Tamme v. Commwealth*,[56] *Baze v. Commonwealth*,[57] *Foley v. Commonwealth*,[58] *Bowling v. Commonwealth*,[59] *Smith v. Commonwealth*,[60] *Halvorsen v. Commonwealth*,[61] *Bevins v. Commonwealth*,[62] and *Harper v. Commonwealth*.[63] On the basis of this review, we have determined that the death sentence imposed on in this case is not excessive or disproportionate to the sentence imposed in similar cases.

Appellant's thirty-sixth claim, that the trial judge's role is sentencing is not so articulated as to pass constitutional muster, has been rejected by this Court.[64]

Appellant's thirty-seventh claim, that he unconstitutionally denied access to death penalty case data, likewise has been previously decided.[65]

Appellant's thirty-eighth claim is that the death penalty is arbitrary and discriminatory. This Court has previously rejected this argument.[66]

**51.** *Tamme*, 973 S.W.2d at 38; *Bowling v. Commonwealth*, Ky., 942 S.W.2d 293, 302 (1997).

**52.** *Buchanan v. Kentucky*, 483 U.S. 402, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987); *Lockhart v. McCree*, 476 U.S. 162, 165, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986); *Wilson v. Commonwealth*, Ky., 836 S.W.2d 872, 890 (1992); *Sanders v. Commonwealth*, Ky., 801 S.W.2d 665, 672 (1991).

**53.** *See, e.g., Wheeler v. Commonwealth*, Ky., 121 S.W.3d 173 (2003); *Woodall v. Commonwealth*, Ky., 63 S.W.3d 104 (2001); *Tamme v. Commonwealth*, Ky., 973 S.W.2d 13 (1998); *Bowling v. Commonwealth*, Ky., 873 S.W.2d 175 (1994).

**54.** *Caudill v. Commonwealth*, Ky., 120 S.W.2d 635, 678 (2003).

**55.** Ky., 121 S.W.3d 173 (2003).

**56.** Ky., 973 S.W.2d 13 (1998).

**57.** Ky., 965 S.W.2d 817 (1997).

**58.** Ky., 942 S.W.2d 876 (1996).

**59.** Ky., 873 S.W.2d 175 (1993) (fourth-degree assault conviction stemming from an injury to the victims' child caused when firing into the automobile).

**60.** Ky., 734 S.W.2d 437 (1987).

**61.** Ky., 730 S.W.2d 921 (1986).

**62.** Ky., 712 S.W.2d 932 (1986).

**63.** Ky., 694 S.W.2d 665 (1985).

**64.** Bowling, 942 S.W.2d at 306.

**65.** *Harper v. Commonwealth*, Ky., 694 S.W.2d 665 (1985).

**66.** *See, e.g., Sanders v. Commonwealth*, KY., 801 S.W.2d 665, 682–83 (1990).

Appellant's thirty-ninth and final claim is that cumulative error requires reversal. As he was not denied a fundamentally fair trial, reversal is not required.[67]

For the foregoing reasons, the judgment of the McCreary Circuit Court is affirmed.

GRAVES, JOHNSTONE, and WINTERSHEIMER, JJ., concur.

KELLER, J., dissents by separate opinion in which COOPER and STUMBO, JJ., join. STUMBO, J., also dissents by separate opinion.

Dissenting opinion by Justice KELLER.

I respectfully dissent from the majority opinion and vote to reverse Appellant's convictions and remand this indictment to the McCreary Circuit Court for a new trial. In my view, Appellant was substantially prejudiced by the erroneous admission of: (1) April Sexton's ("Sexton") irrelevant testimony as to Jean Ferrier's ("Ferrier") and Crystal Conaster's ("Conaster") fears of Appellant; and (2) both Jeannette Musgrove's ("Musgrove") and Gary Roberts's ("Roberts") testimony as to uncharged prior bad acts—specifically, previous occasions upon which Appellant allegedly discharged firearms in Ferrier's direction—which the Commonwealth introduced in violation of a trial court order prohibiting it from introducing such evidence because it had not provided the reasonable pretrial notice required by KRE 404(c). Additionally, although I

agree with the majority's bottom-line conclusion that the inadmissible "investigative hearsay" that was erroneously introduced during Detective McKinney's testimony was harmless in this case, I write separately as to that allegation of error to caution the bench and bar to avoid the introduction of such hearsay evidence in future cases.

## I. VICTIMS' STATES OF MIND

A common thread appears to exist when interpreting whether hearsay statements about the murder victim's fear of a defendant falls under the state-of-mind exception, KRE 803(3), or whether the hearsay statements are relevant. *Where a victim's state of mind is not at issue, the testimony is not allowed to be admitted into evidence.* Specifically, where a defendant did not claim self-defense, an accidental death, or suicide, such statements usually have "little relevancy except toward providing a strong inference of appellant's intent, actions, or culpability."[1]

Because Appellant's alibi defense did not put the victims' states of mind at issue, it was not relevant that Sexton, Conaster, and Ferrier circled the parking lot at the dance hall "because they was afraid that [Appellant] was going to be there,"[2] or that Ferrier had expressly identified her fear as the reason for the decision to circle the lot.[3] Although the majority opinion suggests that this evidence was relevant

---

**67.** *Bowling v. Commonwealth*, Ky., 942 S.W.2d 293 (1997).

**1.** *Partin v. Commonwealth*, Ky., 918 S.W.2d 219, 222 (1996) (citations omitted and emphasis added). I observe that *Partin*, which the majority cites in support of its claim that "[g]enerally, when a victim's state of mind is not at issue, the hearsay testimony is not admissible," *Garland v. Commonwealth*, Ky.,

127 S.W.3d 529, 540, 2003 WL 22429532 *5 (2003) (emphasis added) does not contain the language of equivocation ("generally") that is added by today's majority opinion.

**2.** This was indirect hearsay evidence. *See Sherley v. Commonwealth*, Ky., 889 S.W.2d 794, 801–802 (1994) (Leibson, J., concurring).

**3.** *Bray v. Commonwealth*, Ky., 68 S.W.3d 375, 381–2 (2002).

because it invited speculation as to "why [the victims] would have such fear[,]"[4] the fact that such evidence might lead to conjecture that the Appellant was a "bad guy" whom persons might justifiably fear—*i.e.*, to infer evidence of bad character that is prohibited by KRE 404(a)—is *precisely* the reason that such evidence is *inadmissible*. Although this evidence, standing alone, might not warrant reversal of Appellant's convictions, it was clearly prejudicial, and, in combination with the erroneous introduction of prior bad acts evidence, it deprived Appellant of his right to a fair trial.

## II. REASONABLE NOTICE OF PRIOR BAD ACTS EVIDENCE

KRE 404(c) provides:

*Notice requirement.* In a criminal case, if the prosecution intends to introduce evidence pursuant to subsection (b) of this rule as a part of its case in chief, it shall give reasonable pretrial notice to the defendant of its intention to offer such evidence. Upon failure of the prosecution to give such notice the court may exclude the evidence offered under subsection (b) or for good cause shown may excuse the failure to give such notice and grant the defendant a continuance or such other remedy as is necessary to avoid unfair prejudice caused by such failure.[5]

KRE 404(c)'s notice requirement is designed "to assure that the defense is given an adequate opportunity to investigate the factual basis for evidence of [prior bad acts] and to deal with the dangers of unreliability and prejudice."[6] And, regardless of whether proffered evidence could otherwise be admitted under KRE 404(b), the KRE 404(c) notice requirement operates as a separate hurdle that protects the defendant's right to a fair trial:

[T]he integrity of the trial is jeopardized when previously unknown witnesses appear at the eleventh hour with evidence of uncharged collateral crimes. Even in cases where evidence of prior uncharged criminal activity between the defendant and third persons is admissible, fundamental fairness dictates, and we hold, that the defendant is entitled to be informed of the names of the non-complaining witnesses and the nature of their allegations so far in advance of trial as to permit a reasonable time for investigation and preparation. *See* KRE 404(c).[7]

Approximately eighteen (18) months before the trial in this case, Appellant filed a motion asking the trial court "to enter an order that the Commonwealth provide sufficient notice to the defense of any evidence it intends to present relating to alleged 'bad acts', 'uncharged misconduct', prior convictions (if any), and similar evidence." A week later, after a hearing at which the Commonwealth acknowledged that it would disclose any such evidence that it intended to introduce, the trial court entered a discovery order that provided, in part, that "[t]he Commonwealth shall disclose any and all evidence it intends to present in this case which is in the nature of 'bad act' evidence, uncharged misconduct evidence, and evidence of a similar nature."

---

**4.** *Garland v. Commonwealth, supra* note 1 at 539, at *5 (quoting *Partin v. Commonwealth, supra* note 1).

**5.** KRE 404(c).

**6.** Commentary to KRE 404, Kentucky Evidence Rules Study Commission, Final Draft (1989).

**7.** *Gray v. Commonwealth,* Ky., 843 S.W.2d 895, 897 (1992).

Eleven (11) months later, Appellant filed a *motion to compel discovery* in which Appellant's trial counsel indicated that the Commonwealth had not disclosed its intention to introduce any such evidence. Accordingly, Appellant also filed a motion that asked the trial court to enter an order precluding the Commonwealth "from introducing any KRE 404(b) (prior bad act) evidence during both the guilt phase and penalty phase portions (if any), of the trial in this matter ... because it has not provided the defendant with notice of its intention to present [the] evidence and any attempt to do so now would be untimely and severely prejudice the defendant." There is no indication in the record that the Commonwealth *ever* notified the defense that it intended to introduce KRE 404(b) evidence, and Appellant's motion was resolved by an agreed order of record that provided: "By agreement of the parties, IT IS HEREBY ORDERED that the Commonwealth will present no evidence pursuant to KRE 404(b), relating to John Roscoe Garland, during the guilt phase portion of the trial in the above captioned case."

At trial, however, during the Commonwealth's culpability phase case-in-chief, two (2) different witnesses, Musgrove and Roberts, testified to paradigmatic KRE 404(b) evidence [8]—*i.e.*, Appellant's prior acts of violence towards Ferrier on occasions when Appellant allegedly fired shots at Ferrier's home. Appellant argues that the introduction of this evidence was erroneous because the Commonwealth had not complied with KRE 404(c) by providing reasonable pretrial notice of its intention to introduce the evidence. The majority opinion first holds that the error was not properly preserved for our review because there was no contemporaneous objection at trial on KRE 404(c) grounds. Then, the majority concludes that the prior bad acts evidence was properly admitted at trial because it satisfied KRE 404(b)(1)'s relevancy requirements. I disagree with the majority's analysis.

First, the Kentucky Rules of Evidence compel a different conclusion regarding preservation. KRE 103(d) provides:

> *Motions in limine.* A party may move the court for a ruling in advance of trial on the admission or exclusion of evidence. The court may rule on such a motion in advance of trial or may defer a decision on admissibility until the evidence is offered at trial. *A motion in limine resolved by order of record is sufficient to preserve error for appellate review.* Nothing in this rule precludes the court from reconsidering at trial any ruling made on a motion in limine.[9]

KRE 103(d)'s motion *in limine* rule promotes trial efficiency by, among other things, eliminating the need for unnecessary trial objections when the trial court has already ruled upon an evidentiary admissibility issue:

> A formal mechanism for obtaining advance rulings on the admissibility of evidence would seem to serve at least the following ends: (i) facilitate trial preparations by providing information pertinent to strategic decisions; (ii) reduce distractions during trial and provide for a smoother presentation of evidence to the jury; (iii) enhance the possibility of settlement of disputes without trial; (iv) provide some additional insulation of the

---

8. *See Moseley v. Commonwealth*, Ky., 960 S.W.2d 460, 461 (1998); *Parker v. Commonwealth*, Ky., 952 S.W.2d 209, 214 (1997); *Smith v. Commonwealth*, Ky., 904 S.W.2d 220, 223–224 (1995).

9. KRE 103(d) (emphasis added).

jury from prejudicial inadmissible evidence; and (v) improve the conditions under which the trial judge must address evidence issues by reducing the need for hasty decisions during the heat of trial. The purpose of subdivision (d) is to acknowledge the value of motions in limine and to encourage a more widespread use of the device in the courts of Kentucky.[10]

The Commentary to KRE 103 makes it clear that, if a motion in limine has been resolved by an order of record, no trial objection is necessary to preserve an allegation of error raised in the motion in limine:

> In some jurisdictions the case law leaves doubt about the extent to which motions in limine may be used to preserve errors for review. As a result litigants are forced to renew objections or offers of proof at trial even though brought to the attention of the judge and opposing counsel prior to trial. Subdivision (d) eliminates this doubt by providing that motions in limine resolved by order of record are sufficient to preserve errors for appellate review. By requiring that such motions be resolved by "order of record," an adequate record for the appeals court should be assured.[11]

Accordingly, Appellant's allegation of error was preserved for our review by the trial court's agreed order prohibiting the Commonwealth from introducing KRE 404(b) evidence at the culpability phase of Appellant's trial.[12]

The majority acknowledges KRE 103(d), but instead of applying the language of the rule, relies upon *Tucker v. Commonwealth* [13] and concludes that the allegation of error was unpreserved because Appellant did not object to the testimony at trial. I question the majority's reliance on *Tucker* and observe that both of the cases that *Tucker* cited as support for this questionable proposition predate our adoption of the Kentucky Rules of Evidence. Moreover, the leading authorities on Kentucky evidence law have questioned the *Tucker* holding and characterized it as "plainly at odds with KRE [103(d) ]" [14] and "in direct conflict with the language of KRE 103(d)!" [15] Thus, to the extent that *Tucker* stands for a proposition that is directly contrary to the language of KRE 103(d), the opinion should be overruled. However, additional language in *Tucker*—specifically the two (2) sentences that appear just before the language quoted in today's majority opinion—render *Tucker*'s holding somewhat opaque and suggest that, in context, *Tucker* may have turned upon differences between Tucker's argument on appeal and the objection he raised in his motion in limine: "An objection made prior to trial will not be treated in

---

**10.** Commentary to KRE 103, Kentucky Evidence Rules Study Commission, Final Draft (1989).

**11.** *Id.*

**12.** *See Prater v. Cabinet for Human Resources,* Ky., 954 S.W.2d 954, 959 (1997). *Cf. O'Bryan v. Hedgespeth,* Ky., 892 S.W.2d 571, 574–5 (1995) (holding that motion in limine preserved error for appeal and that the objecting party did not waive the allegation of error when it subsequently introduced the evidence to which it had objected).

**13.** Ky., 916 S.W.2d 181 (1996).

**14.** Robert G. Lawson, KENTUCKY EVIDENCE LAW HANDBOOK, § 1.10(V) (3d. ed. Michie 1993, 2000 supp.).

**15.** Richard H. Underwood and Glen Weissenberger, KENTUCKY EVIDENCE: 2004 COURTROOM MANUAL, at 11 (Anderson Publishing Co.2003).

the appellate court as raising any question for review *which is not strictly within the scope of the objection as made, both as to the matter objected to and as to the grounds of the objection.* It must appear that the question was fairly brought to the attention of the trial court."[16] Although I would agree that a motion *in limine* would not preserve an objection if the trial court could not have anticipated that the specific evidence in question fell within the scope of the objection raised in the motion *in limine*,[17] the evidence in this case as to the alleged prior shooting episodes was quintessential KRE 404(b) evidence—simply stated, the evidence could not have been admitted under any rule other than KRE 404(b)—and Appellant's motion *in limine* preserved his claim for appellate review.

The majority's conclusion that the evidence introduced would have satisfied KRE 404(b)(1)'s relevancy requirements is a non sequitur to the issue in this case, which is whether the evidence should have been excluded because of the Commonwealth's failure to provide the notice required by KRE 404(c). Unlike other cases where the record has demonstrated that the defendant had actual notice of the Commonwealth's intention to introduce KRE 404(b) evidence,[18] there is no suggestion in this record that the Commonwealth

ever gave notice of its intention to introduce this evidence and, in fact, the record reflects that the Commonwealth affirmatively agreed that it *would not introduce* any KRE 404(b) evidence during the culpability phase of Appellant's trial. Although KRE 103(d) permits a trial court to reconsider its ruling *in limine*, the Commonwealth did not ask the trial court to do so before it introduced the evidence. Thus, the KRE 404(b) evidence was erroneously admitted in violation of the trial court's order sustaining the Appellant's pretrial KRE 404(c) reasonable notice objection, and the pretrial ruling removed any need for a contemporaneous objection. Although this evidence would likely have been admissible if the Commonwealth had provided the defendant with reasonable notice of its intention to introduce it, the Commonwealth's failure to provide reasonable notice made its introduction improper, and the nature of the evidence belies any suggestion that its erroneous admission could be harmless.

## III. INVESTIGATIVE HEARSAY

It was hoped that *Sanborn v. Commonwealth*[19] was the death-knell for the so-called "investigative hearsay exception" to the hearsay rule.[20] I fear that today's

**16.** *Tucker v. Commonwealth, supra* note 13 at 183 (emphasis added).

**17.** *See* Commentary to KRE 103, Kentucky Evidence Rules Study Commission, Final Draft (1989) ("It should be noted that a motion in limine would not be sufficient to preserve errors for appellate review unless it provided the trial court with the type of information which would be required to preserve errors raised at trial[.]"); *Sherley v. Commonwealth, supra* note 2 at 803 (Leibson, J., concurring) ("We should not extend the reach of protection by motion in limine to cases where we cannot infer the trial court knew evidence excluded by motion in limine was being introduced anyway. Present circumstances called

for defense counsel to speak up if he wished to preserve error.").

**18.** *See Walker v. Commonwealth*, Ky., 52 S.W.3d 533, 538 (2001); *Tamme v. Commonwealth*, Ky., 973 S.W.2d 13, 31–32 (1998); *Bowling v. Commonwealth*, Ky., 942 S.W.2d 293, 300 (1997).

**19.** Ky., 754 S.W.2d 534 (1988).

**20.** *Id.* at 541 ("Perhaps it would help to state forcefully at the outset that hearsay is no less hearsay because a police officer supplies the evidence. In short, there is no separate rule, as such, which is an investigative hearsay exception to the hearsay rule.")

majority opinion's analysis of the investigative hearsay issues presented here will either resuscitate the "exception" or, by suggesting that subsequent testimony from the declarant "erases" such errors, otherwise pave the way for the introduction of hearsay evidence.

Accordingly, as to the "investigative hearsay" introduced during Detective McKinney's testimony, I wish to emphasize two (2) things. First, Detective McKinney should not have been permitted to testify as to out-of-court statements made by Clayton Stephens ("Stephens") and Chuck Lanham ("Lanham"). Although the majority opinion describes Detective McKinney's testimony as to Stephens's out-of-court statements as "technically hearsay," it was unquestionably *error* to permit Detective McKinney to "give a preview of" Stephens's testimony by relating Stephens's previous out-of-court statements. Moreover, a prosecutor's expectation that a declarant will testify later in the trial is wholly irrelevant to the *admissibility* of hearsay evidence as to the declarant's statements, and Stephens's subsequent in-court testimony could not "erase" the previous error. Similarly, Detective McKinney's testimony as to Lanham's out-of-court statements was inadmissible, and the fact that Lanham's conclusion was supported by an entirely different expert, Dwight Deskins, did not eliminate the erroneously-admitted hearsay evidence.

Second, although I agree with the majority's conclusion that the improper hearsay evidence was harmless in this case, I do so because, in my view, Appellant was not prejudiced by the *substance* of the erroneously admitted hearsay testimony. I wish to emphasize, however, that, in many cases, the erroneous admission of "investigative hearsay" will not be rendered harmless merely because the declar-

ant subsequently testifies at the trial. Here, Detective McKinney's testimony improperly bolstered Stephens's testimony regarding Appellant's son's purchase of a .357 Magnum handgun and erroneously supplied an additional expert's opinion that the handgun purchased from Stephens did not fire the rounds that killed the victims in this case. Because the "issue" of whether this handgun was used in the commission of this offense was not seriously disputed and, in my estimation, was largely inconsequential to the resolution of this case, I agree with the majority that the erroneous introduction of this hearsay evidence was harmless on these facts. However, in a case where the improperly admitted hearsay testimony bolsters or adds testimony on an issue of more substance, investigative hearsay of this type may warrant a new trial.

COOPER and STUMBO, JJ., join.

Dissenting opinion by Justice STUMBO.

Respectfully, I dissent from the majority's opinion regarding the failure to give an instruction on Appellant's extreme emotional disturbance (EED), and also because the jury impermissibly heard evidence that Appellant had taken a polygraph examination. Either of these errors constitutes reversible error.

Although Appellant did not request an instruction on first-degree manslaughter, the trial court has a duty to instruct the jury on the whole law of the case. *Lee v. Commonwealth*, Ky., 329 S.W.2d 57, 60 (1959). "This general rule requires instructions applicable to every state of case covered by the indictment and deducible from or supported to any extent by the testimony." *Id.* This rule holds true regardless of whether Appellant requested a lesser-included instruction. *Id. See also Trimble v. Commonwealth*, Ky., 447 S.W.2d 348, 350 (1969) (stating that

"[w]hen the prosecution adduces evidence warranting an inference of a finding of a lesser degree of the charged offense, the court should instruct on the lesser degree even though the defendant presents the defense of alibi.")

There was ample evidence in this case to suggest that Appellant was suffering from EED prior to the incident. There was testimony that one of the victims had broken up with Appellant and that she was carrying another man's child. There had been repeated incidents where Appellant fired a gun outside the victim's trailer after she had broken up with him. Also, the evidence suggested that upon entering the victim's trailer, the two began to fight, but that Appellant did not start shooting until a partially clad man emerged from the bedroom. It was possible that Appellant did not know whom the man was with in the bedroom.

The majority dismisses these possible scenarios as not meeting the standard for an EED instruction because Appellant's behavior was not continuous, and because a partially clad man emerging from the bedroom was not a viable triggering event because the man was with the other victim and not Appellant's ex girlfriend.

We have held that the onset of EED " 'may be more gradual than the "flash point" normally associated with sudden "heat of passion", so long as the condition is "a temporary disturbance of the emotions" as opposed to mental derangement per se.' " *Springer v. Commonwealth,* Ky., 998 S.W.2d 439, 452 (1999) (quoting *McClellan v. Commonwealth,* Ky., 715 S.W.2d 464, 468 (1986)). In *Springer,* we specifically stated, "[t]he fact that the triggering event may have festered for a time in [the appellant's] mind before the explosive event occurred does not preclude a finding that she killed her husband while under the influence of [EED]." 998 S.W.2d at 452.

Likewise, the facts of this case did not preclude a finding of EED. Appellant was entitled to have the jury weigh the evidence and make that decision.

Secondly, I must disagree with the majority's holding that the references made to Appellant having taken a polygraph exam were not grounds for reversal. It has long been held that the "mere mention of the taking of a polygraph examination without disclosure of the result" is error. *Morgan v. Commonwealth,* Ky., 809 S.W.2d 704, 706 (1991); *Ice v. Commonwealth,* Ky., 667 S.W.2d 671 (1984); *Perry v. Commonwealth,* Ky., 652 S.W.2d 655 (1983). This Court reversed a conviction for murder in *Morgan, supra,* simply because it was disclosed to the jury that an interrogation of the defendant took place in a room that contained a polygraph instrument. The majority cites to no authority that says the result is different if the defense's own witnesses made the reference to the polygraph. The outcome is the same. The jury could have inferred that since the results of the polygraph were not admitted, Appellant must have failed it. This was prejudicial error requiring reversal for a new trial.