*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0173P (6th Cir.)
File Name: 04a0173p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

RALPH STEPHENS BAZE, JR.,
*Petitioner-Appellant,*

*v.*

No. 03-5112

PHILIP PARKER, Warden,
Kentucky State Penitentiary,
*Respondent-Appellee.*

———————

Appeal from the United States District Court
for the Eastern District of Kentucky at Ashland.
No. 01-00031—Henry R. Wilhoit, Jr., District Judge.

Argued: December 10, 2003

Decided and Filed: June 9, 2004

Before: BOGGS, Chief Judge; and COLE and COOK,
Circuit Judges.

———————

## COUNSEL

**ARGUED:** Timothy T. Riddell, PERCH & TOBY,
Lexington, Kentucky, for Appellant. David A. Smith,
OFFICE OF THE ATTORNEY GENERAL, Frankfort,
Kentucky, for Appellee. **ON BRIEF:** Timothy T. Riddell,

---

Milton Coburn Toby, PERCH & TOBY, Lexington,
Kentucky, for Appellant. David A. Smith, Brian T. Judy,
OFFICE OF THE ATTORNEY GENERAL, Frankfort,
Kentucky, for Appellee.

BOGGS, C. J., delivered the opinion of the court, in which
COOK, J., joined. COLE, J. (pp. 29-38), delivered a separate
opinion concurring in part and dissenting in part.

———————

## OPINION

———————

BOGGS, Chief Judge. Petitioner Ralph Baze, Jr. was
convicted of the 1992 murders of Sheriff Steven Bennett and
Deputy Sheriff Arthur Briscoe, whom he shot in the back
when they attempted to arrest him pursuant to an outstanding
Ohio multiple-felony arrest warrant. The jury sentenced Baze
to death. The Kentucky Supreme Court affirmed his
conviction and sentence on direct appeal, and it denied relief
in state post-conviction proceedings. Baze petitioned for
federal habeas relief, pursuant to 28 U.S.C. § 2254, which the
United States District Court for the Eastern District of
Kentucky denied in a series of exhaustive opinions. For the
reasons elaborated upon below, we affirm the district court's
denial of Baze's petition.

## I

Ralph Baze lived in Powell County, Kentucky, in a
mountain hollow known as Little Hardwick's Creek, with his
wife. Some of his other relatives lived on another ridge of the
same mountain. His cabin was at the end of gravel road,
heavily wooded on both sides, approximately 1,000 feet up
the mountain, in a small clearing that made maneuvering a
vehicle very difficult. By January 1992, the time of the
shootings, Baze was a twice-convicted felon and was wanted

in Ohio for felonious assault of a police officer, jumping bail, receiving stolen property, and flagrant non-support.

On January 15, 1992, authorities from the Lucas County Sheriff's Office in Toledo, Ohio notified the Powell County authorities that they wished to extradite Baze on the felony counts. At that time, Baze was in Ohio, and his wife, Becky Baze, informed the police that she did not know where he was when they came to arrest her husband in mid-January. She then phoned Baze to warn him that the police were looking for him. Baze left Ohio for Michigan, where he bought a SKS assault rifle and ammunition, which he ultimately used to kill the two police officers.

Baze returned to his brother-in-law's house in nearby Bath County, Kentucky, on January 28 and decided to move to Florida. He returned to his cabin on January 30 with his wife, and his siblings-in-law, Wesley and Sophie McCarty, intending to hold a yard sale to lighten their load and then to leave for Florida that evening. Deputy Sheriff Briscoe heard that Baze was back in town and proceeded to Baze's cabin to arrest him. When Briscoe arrived, Baze was inside; however, he could hear Briscoe announce his intention to Becky to arrest her husband. While Briscoe returned to his cruiser, Baze left the cabin through a trapdoor in the bedroom floor, retrieved his SKS assault rifle from behind the cabin, and then walked around the cabin to inform Briscoe that he would not allow himself to be arrested. Wesley McCarty intervened to avoid a confrontation, during which Briscoe put his hand on or near his holster. Becky grabbed Briscoe's arm, and Baze used the opportunity to leave the immediate area. Briscoe then left in his cruiser to recruit additional officers to effect the arrest.

Baze used the interim to gather his personal belongings, and 98 rounds of ammunition, and went uphill into the woods. He later told the *Louisville Courier-Journal* that he circled around to hide behind a stump behind the spot where the police would have to leave their cars. Deputy Briscoe

arrived back first, followed by Sheriff Bennett. Both got out of their cruisers with their guns out and they came together on the rear driver's side of Bennett's cruiser. Baze's wife Becky was yelling at them from the porch of the cabin, so that when they turned to engage her, they had their backs to the woods where Baze was hiding. All agree that at that moment gunfire began.

Baze testified that he moved out from behind a large stump and brush pile, unarmed, intending to surrender, but that Briscoe shot him in the leg with a pistol. Wesley and Sophie McCarty supported Baze's version by testifying that Baze stood up without a gun. In contrast, Baze's son-in-law, Greg Profitt, who was also at the house, testified that Baze shot first, but he admitted that he could not distinguish between rifle and pistol fire. Becky Baze also testified that Baze shot first, causing Bennett to turn his head back to his right to see where the gunfire was coming from. The policemen who were driving up the road to lend support testified that the first 6-10 shots they heard were rifle fire.

Briscoe and Bennett then turned to face the woods and took cover behind the police cruiser on the driver's side, with Briscoe shooting over the hood and Bennett over the trunk. For reasons that are unclear, Bennett moved around the rear of the cruiser and opened the back passenger door as if to get into the back seat, in fact crossing directly into Baze's line of fire. Thereupon, Baze shot him three times in the back. Baze then started to walk down the hill towards Briscoe, who continued to shoot at Baze over the hood of the police cruiser until he ran out of ammunition, and Baze was too close to give him time to reload. Briscoe then turned to attempt to escape and, after he had gone about ten feet, Baze shot him twice in the back. Wesley McCarty described Briscoe as "staggering away" before he fell on his face. Baze then approached the fallen officer and, allegedly thinking that he might be reaching for his gun, shot Briscoe in the head at point-blank range.

Baze then picked up the weapons and ammunition and fled on foot to adjoining Estill County. He surrendered without incident at 8 p.m. that evening at the home of the former Estill County Sheriff, where he received his *Miranda* warnings. Upon overhearing a query over the radio as to whether the arresting officer had the correct suspect, Baze responded: "You tell them that you got the right man. I'm the one that killed them son-of-a-bitches."

Baze was tried in Rowan County, convicted, and sentenced to death in February 1994 for shooting the officers. The Kentucky Supreme Court affirmed the sentence on direct appeal in November 1997. *Baze v. Commonweath*, 965 S.W.2d 817 (Ky. 1997) (*Baze I*). The United States Supreme Court denied certiorari in April 1998. Baze filed a motion to vacate his sentence under Kentucky's post-conviction review procedure, asserting, among other things, ineffective assistance of counsel due to irregularities in the use of his peremptory challenges. The state trial court denied the motion to vacate without conducting an evidentiary hearing, a decision that the Kentucky Supreme Court affirmed in April 2000. *Baze v. Commonweath*, 23 S.W.3d 619 (Ky. 2000) (*Baze II*). Certiorari was again denied, in February 2001.

Baze then filed a petition for a writ of habeas corpus in the United States District Court for the Eastern District of Kentucky in April 2001. The district court denied a motion for an evidentiary hearing on September 23, 2002, and denied the habeas petition four days later. The district court denied a motion to alter or amend the judgment on December 23, 2002 but "in an abundance of caution" issued a certificate of appealability on all of the issues that Baze raised. Baze then filed an appeal with this court asserting twelve points of error. Most salient for this opinion are his assertions of ineffective assistance of counsel and improper limitations on his ability to exercise his peremptory challenges. He also alleges denial of due process because of claims of: 1) trial court interference with presentation of a defense; 2) refusal to strike six jurors for cause; 3) improper jury admonition, instructions, and

verdict form; 4) improper introduction of character evidence and unrelated out-of-state charges; 5) refusal to introduce Baze's federal firearms sentence; and 6) cumulative effect of errors.

## II

When reviewing a denial of habeas corpus relief, this court reviews the district court's legal conclusions *de novo* and its factual findings under a "clearly erroneous" standard. *Skaggs v. Parker*, 235 F.3d 261, 266 (6th Cir. 2000). The Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA) governs the review of the state court decisions involved in this case and mandates additional deference to state court proceedings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998).

In AEDPA, Congress provided that:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--

(1) resulted in a decision that was contrary to, or an involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court decision is "contrary to" Supreme Court precedent "if the state court arrives at a conclusion opposite to that reached by [the] Court on a question of law," or "if the state court confronts facts that are materially indistinguishable

from a relevant Supreme Court precedent and arrives at a result opposite to" the Court's decision. *Williams v. Taylor,* 529 U.S. 362, 405 (2000). A state court decision involves an "unreasonable application" of clearly established Supreme Court precedent when it correctly identifies the governing legal standard but applies that standard in an objectively unreasonable, as opposed to merely incorrect, manner. *Id.* at 409-11. Furthermore, state findings of fact are presumed to be correct unless the defendant can rebut the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Finally, review is conducted in light of the law as it existed at the time of the final state court decision, *Teague v. Lane*, 489 U.S. 288 (1989), unless an intervening constitutional decision announces a "watershed" rule of criminal law with implications for the fundamental fairness of the trial proceeding. *Caspari v. Bohlen*, 510 U.S. 383, 396 (1994).

Most of Baze's habeas claims are based on challenges to interpretations of state law and therefore this court may only grant relief if his Fourteenth Amendment Due Process rights are implicated, an extremely high standard that Baze cannot meet. *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) (stating that federal habeas corpus relief does not lie for errors of state law). Therefore, we will consider Baze's clear constitutional claim – ineffective assistance of counsel – first, and then address the claims based on state law.

*Ineffective Assistance of Counsel*

Baze argues on appeal that he was denied effective assistance of counsel when his lawyers negligently omitted the name of a corrections officer from the list of peremptory strikes, which resulted in the officer sitting on the jury.

The events that resulted in Ms. Sharon Perkins, a corrections officer, sitting on Baze's jury are somewhat convoluted. Ms. Perkins approached the judge with another corrections officer to bring to his attention their potential bias. In response to the judge's questions, Ms. Perkins initially said

that her job would affect her ability to be impartial, but then, upon further probing by the judge, changed her mind, stating that she could listen to testimony and be fair. During the subsequent individual *voir dire*, Ms. Perkins stated that she had been a corrections officer for six years but that her job would not affect her judgment in the case. She also did not think she would feel pressure from her prison colleagues to render a particular verdict.

The defense moved that she be struck for cause, both because of her job knowledge about parole and sentencing rules, and because she might be swayed by the remote possibility that she would meet Baze in prison, should he be convicted but not sentenced to death. The court denied the motion, after questioning Ms. Perkins to make sure that she was not intimidated by the theoretical possibility of meeting Baze at some later date. Nothing in the record suggests that this court should not defer to the trial court's determination that Ms. Perkins's responses were credible and that she could be impartial. 28 U.S.C. § 2254(e)(1); *see Patton v. Yount*, 467 U.S. 1025, 1038 (1984).

After the *voir dire*, the court instructed counsel to submit their lists of peremptory strikes by 8:45 the next morning. Defense counsel conferred that night and eliminated nine potential jurors, Baze's statutory limit, including Ms. Perkins. Mr. Riley, the lead counsel, described to the judge what happened then:

We picked the nine, put it on a piece of paper, and, left the piece of paper with the other two individuals on the defense team, with the instructions to write down the strikes. I didn't even look at them. They were late getting here this morning. I grabbed the piece of paper from them, copied it, gave it – and, about the same time, they noticed there was eight, we noticed there was eight. We had decided, as a team, not to ask for the ninth, because it was our mistake, and we screwed up. At that time, your paralegal and the clerk came out, and, said

there was a ninth one . . . . So, we gave them the ninth name. We will live by any ruling of the Court. I don't expect them to believe that it was an unintentional error, but I tell you, it was an unintentional error, on our part.

Both the judge and the district attorney accepted the contention that the error was inadvert, but the prosecution immediately objected to amending the strike list to include Ms. Perkins. The judge initially decided to resolve the question by eliminating the final juror by lottery.[1] At that point in the proceedings, another potential juror, Willie Wagoner, requested to be excused because his wife opposed the death penalty, although he did not. He feared, however, that his participation in the trial would "cause conflict . . . in my home." The judge decided that he should be excused and proceeded "as if he [Wagoner] would be the juror that was struck." In essence, therefore, the judge exercised Baze's final peremptory strike. Baze's lawyer responded: "We are not crazy about giving up any of the jurors that we didn't strike, but, we will live with whatever the . . . [court decides]." The prosecution responded that "[I] will abide by the Court's ruling, but I will object to it." As a result, Ms. Perkins sat on the jury and ultimately voted with her fellow jurors both to find Baze guilty and to impose the death penalty.

In two paragraphs, the Kentucky Supreme Court considered and rejected Baze's ineffective assistance of counsel argument related to the *voir dire* described above, on the grounds that the claim, litigated on its merits in *Baze I*, could not be resubmitted under the guise of ineffective assistance of counsel. *Baze II*, 23 S.W.3d at 624 (citing *Sanborn v. Commonwealth*, 975 S.W.2d 905 (1998), *cert. denied*, 526

---

[1]Under local court procedure, fourteen jurors hear all of the evidence and then two are chosen by lottery as alternates, after the closing arguments, and do not participate in the deliberations. Therefore, excusing extra jurors by lottery is a well-established practice in Kentucky state courts. *See also* Ky. R. Crim. P. 9.36(2).

U.S. 1025 (1999)). The Kentucky Supreme Court also held that the decision not to use the peremptory challenge against Ms. Perkins amounted to "trial strategy." It did not refer to the specific circumstances of this case in its decision, characterizing the appellant's argument as: "his trial counsel was constitutionally deficient in negligently failing to exercise a ninth peremptory challenge available to the defense." *Baze II*, 23 S.W.3d at 623. The court then simply analyzed the claim under the law governing peremptory challenges, rather than ineffective assistance of counsel.

Although the point was not argued in either brief, this court must first consider if we may review Baze's claim, given that it is procedurally barred under Kentucky law, as set down in *Sanborn*. Nevertheless, the Kentucky Supreme Court addressed, albeit in summary fashion, Baze's claim on the merits. *Baze II*, 23 S.W.3d at 624. If a state court does not expressly rely on a procedural deficiency, then a federal court may conduct habeas review. *Caldwell v. Mississippi*, 472 U.S. 320, 327 (1985); *Bowling v. Parker*, 344 F.3d 487, 499 (6th Cir. 2003) (proceeding to consideration of the merits of petitioner's claims because the Kentucky Supreme Court reviewed the ineffective assistance of counsel claims on the merits, in spite of a procedural bar to review, and therefore the reliance on procedural default was not "unambiguous"). Subsequent discussion of the merits did not always cast a doubt on the procedural bar, however. *Simpson v. Jones*, 238 F.3d 399, 407-09 (6th Cir. 2000); *Clifford v. Chandler*, 333 F.3d 724, 728-29 (6th Cir. 2003), overruled in part on other grounds by *Wiggins v. Smith*, 123 S.Ct. 2527 (2003). *Clifford* held that when a state court relies on an independent procedural ground to deny relief, a discussion of the merits will not supersede the procedural bar to habeas relief.

Although it could be argued that the Kentucky Supreme Court relied on the procedural bar to dismiss Baze's claim of ineffective assistance of counsel, the district court held that the claim was not procedurally defaulted and considered it on the merits. The Commonwealth of Kentucky did not raise the

question of procedural default in its response brief to Baze's appeal, but rather opposed the claim on the merits. The state may waive a defense by not asserting it. *Scott v. Collins*, 286 F.3d 923, 927-28 (6th Cir. 2002). Therefore, we also consider Baze's ineffective assistance claim on the merits.

AEDPA requires that a court considering a habeas petition limit its analysis to the law as it was "clearly established" under Supreme Court precedent at the time of the state court decision. 28 U.S.C. § 2254(d)(1). At the time of *Baze II*, the *Strickland* two-part test for determining ineffective assistance of counsel was well-known, *Strickland v. Washington*, 466 U.S. 668 (1984), and governed the analysis of the claim. *Miller v. Francis*, 269 F.3d 609, 615 (6th Cir. 2001). We are unsure whether the Kentucky Supreme Court applied the *Strickland* test in its discussion of Baze's ineffective assistance of counsel claim. *Baze II*, 23 S.W.3d at 624. We need not decide whether AEDPA deferential review should be applied to the state court's decision in this respect because even if we were to review the claim *de novo*, Baze has not established that he was prejudiced by his counsel's mishandling of the peremptory strike list.

Under *Strickland*, courts are required to determine whether 1) the performance of the attorney fell below an objective standard of reasonableness; and 2) the deficient performance prejudiced the defense. *Strickland,* 466 U.S. at 688, 691-92. A clerical error such as one at issue in this case does not give rise to automatic relief. *Yarborough v. Gentry*, 124 S. Ct. 1, 6 (2003). Rather, the Sixth Amendment guarantees reasonable competence, not perfect litigation. *Ibid.* (citing cases); *McQueen v. Scroggy*, 99 F.3d 1302, 1315 (6th Cir. 1996) (stating that an attorney "merely losing, being wrong, or miscalculating is not enough to free every person convicted of a crime").

We do not need to address the question of competence, however: "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that

course should be followed." *Strickland*, 466 U.S. at 697. Although the performance of Baze's counsel arguably fell below reasonable competence, Baze cannot show that he was prejudiced by these deficiencies. Nothing in the record suggests "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Even with a jury not entirely in line with Baze's preferences, the trial was not unreliable or fundamentally unfair. *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993).

Of the fourteen veniremen selected to hear the evidence during trial, eleven, including Ms. Perkins, answered the questions about attitudes toward the death penalty without significant elaboration, stating that they could impose it if warranted, as the Supreme Court required in *Wainwright v. Witt*, 469 U.S. 412, 424 (1985). One answered that she would "consider it less," but reaffirmed that she would decide on the evidence. The Commonwealth unsuccessfully moved to strike her for cause on the grounds that she would not consider the death penalty, and the record shows that she was removed from a previous death penalty case jury through a peremptory strike. Another juror stated that he would start by thinking about the death penalty, but would consider the range of penalties. The defense unsuccessfully objected to him on the grounds of insufficient follow-up to his responses. Finally, Baze's counsel interpreted a third juror's comment in general voir dire to mean that she would only reject the death penalty if the crime were a crime of passion, which in Kentucky is a non-death penalty offense. The defense did not move to have her removed for cause.

On balance, therefore, the record reveals that eleven of the jurors were neutral on the death penalty (able to condemn a guilty defendant to death but not impose the death penalty automatically); two may have leaned slightly towards the death penalty as the most proper sanction for murder, and one may have leaned in the other direction. Given that make-up, no plausible argument for prejudice can be made.

Baze argues that the trial judge prejudiced his case when he excused Juror Wagoner, who, after being qualified, approached the judge just before the panel was sworn in to state that sitting on the jury would cause difficulties in his marriage. Baze theorizes that Wagoner would have been disinclined to impose the death penalty in deference to his wife's moral convictions against it. This assumption presupposes that Wagoner, to placate his wife, would have violated his oath as a juror to base his decision solely on the evidence presented in court. Had he been willing to bend the rules, however, he would not have asked to be excused since he could have avoided marital strife simply by following his wife's wishes; his scruples indicate that he took the process seriously, and therefore Baze's theory that Wagoner would have voted against the death penalty is not convincing.

Wagoner seemed hesitant about the death penalty in the individual voir dire, stating that it was appropriate under "certain circumstances." Ironically, the defense wanted the judge to question Wagoner further before finding him qualified because of the attorney's experience that when a potential juror says he would impose the death penalty "in certain circumstances," he means "in this case." The judge declined to do so, finding Wagoner qualified based on his responses in the individual voir dire. Nothing in the record even hints that Wagoner would have voted against the death penalty or that the outcome of the trial would have been different had he remained. Even had Ms. Perkins been included on the original strike list, it seems clear that the judge would have excused Wagoner as well. Therefore, Baze would not have had the benefit of his sympathy, if any, in any event.

Furthermore, Baze did not have a right to have a specific juror decide his case, only that all jurors be qualified. *McQueen*, 99 F.3d at 1328 (stating that "once the jury is qualified, any combination of twelve of the fourteen jurors is as valid as any other"). Had the judge agreed to allow the defense to exercise belatedly its last strike to remove Perkins,

and then excused Wagoner, the record does not reveal who the next juror would have been. The judge suspended individual voir dire after 29 jurors were qualified. Four additional jurors had made it to the second jury pool of thirty, but the record only contains their names. As a precaution, the judge asked them to return the morning that the jury was seated in case one or more jurors had second thoughts overnight, but once Wagoner had been excused and Perkins seated, evening out the numbers, these four extra potential jurors were excused without any inquiry into their qualifications to sit on the jury.

Therefore, one is left with pure speculation on whether the outcome of the trial or the penalty phase could have been any different, an insufficient basis for a successful claim of prejudice. *McQueen*, 99 F.3d at 1321 (stating that a defendant cannot successfully claim constitutional error simply because he might have been better off with a different jury). Although the procedure for removing Wagoner from the jury was somewhat improvised, it was constitutional. *United States v. Mosely* 810 F.2d 93, 96 (6th Cir. 1987) (citing cases for the rule that "the manner in which the peremptory challenges are exercised is a matter of local custom and traditionally has been left to the sound discretion of the district court"). Whatever errors Baze's lawyers committed, they did not prejudice his defense, and therefore his claim of ineffective assistance of counsel must fail.

### III

Federal courts are highly circumscribed in their ability to second-guess state supreme court rulings on state law in order to grant habeas relief. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). The Supreme Court has made clear that "federal habeas corpus relief does not lie for errors of state law." *Lewis*, 497 U.S. at 780. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States. 28 U. S. C. § 2241(c); *Rose v. Hodges*, 423 U.S. 19, 22

(1975) (per curiam)). Habeas relief may be granted when a state court unreasonably applies Federal law, or a state court is incorrect to such a degree that it implicates the defendant's right to a fair trial because an unreasonable determination of the facts tainted the final outcome. *See Williams*, 529 U.S. at 412-13.

Baze argues that a Kentucky criminal rule requiring simultaneous exercise of peremptory challenges deprived him of his opportunity to voluntarily and intelligently exercise those challenges. Baze has no constitutional right *per se* to a set number of peremptory strikes. *Ross v. Oklahoma*, 487 U.S. 81, 89 (1988) ("peremptory challenges are a creature of statute and are not required by the Constitution."). He only has a right to receive "that which state law provides." *Ibid.* Under the Kentucky Rules of Criminal Procedure, "[p]eremptory challenges shall be exercised simultaneously by striking names from the list and returning it to the trial judge." RCr 9.36(2). No juror can be challenged after being accepted "unless the court for good cause permits it." RCr 9.36(3). In this case, the judge warned the attorneys on two occasions that the list of peremptory strikes would be due at a certain time and that the list could not be amended once submitted. Baze has not asserted that the relevant rules are unconstitutional in light of *Swain v. Alabama*, 380 U.S. 202 (1965), the case upon which he relies. Because this is a claim stemming from the application of state procedural rules, it is beyond our purview on habeas review. *McGuire*, 502 U.S. at 67-68.

*Impermissible Interference with Right to Present a Defense*

Baze argues that the trial court interfered with his right to put on a defense and therefore denied him his due process rights. Kentucky law allows a defense to murder if the killer acts "under the influence of an extreme emotional disturbance [EED] for which there is a reasonable explanation or excuse." KRS § 507.020(1)(a). To mount an EED defense, Baze wanted to introduce evidence that he was engaged in a feud

with his wife's family. According to Baze, his relatives had called in false reports to the police to harass him, and the feud had escalated to the point that he felt his life was in danger. The feud fed into his underlying paranoia, resulting in his belief that the officers' attempted arrest on an outstanding Ohio warrant was just another dirty trick set up by his relatives, and he therefore had to defend himself.

The trial judge allowed some evidence of the feud to be introduced, but he determined that Baze could not base his defense on the incidents with his wife's family because the two officers were not directly involved in the family altercation, and Baze did not have a contentious relationship with either of the victims. The Kentucky Supreme Court held that the trial judge ruled correctly that the feud was not relevant to the killings, and that he had not abused his discretion by limiting the evidence of the intra-familial conflict. *Baze I*, 965 S.W.2d at 821.

A fair opportunity to present a defense is a constitutional right. *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (citing cases). Presenting relevant evidence is integral to that right. *Taylor v. Illinois*, 484 U.S. 400, 408-09 (1988) (stating that "[t]he need to develop all relevant facts in the adversary system is both fundamental and comprehensive"). In particular, few rights are more fundamental than that of an accused to present witnesses in his own defense. *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973) (citations omitted). However, this right is not absolute. The defendant "must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Ibid.* States have broad authority to promulgate rules that exclude evidence so long as they are not "arbitrary" or "disproportionate to the purposes they are designed to serve." *United States v. Scheffer*, 523 U.S. 303, 308 (1998) (citing *Rock v. Arkansas*, 483 U.S. 44, 56 (1987) (internal citations omitted)). Accordingly, the Constitution leaves judges "wide latitude"

to exclude evidence that is only "marginally relevant." *Crane*, 476 U.S. at 689.

Exclusion of evidence only raises constitutional concerns if it has "infringed upon a weighty interest of the accused." *Scheffer*, 528 U.S. at 308 (citations omitted). Only if "an evidentiary ruling is so egregious that it results in a denial of fundamental fairness [does] it . . . violate due process and thus warrant habeas relief." *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003), *cert. denied sub nom. Bugh v. Bradshaw*, 124 S. Ct. 345 (2003) (stating that "[g]enerally, state-court evidentiary rulings cannot rise to the level of due process violations unless they 'offend[ ] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'") (internal citations omitted)); *Estelle*, 502 U.S. at 67 (rejecting the Ninth Circuit's reliance on its own determination that evidence had been improperly admitted to justify habeas relief because "[s]uch an inquiry . . . is no part of a federal court's habeas review of a state conviction").

In order to qualify for an extreme emotional disturbance instruction under Kentucky law, the defendant must produce "some definitive, non-speculative evidence" that the onset of the extreme emotional disturbance was caused by a triggering event. *Morgan v. Commonwealth,* 878 S.W.2d 18, 20 (Ky. 1994); *see Patterson v. New York,* 432 U.S. 197, 210 (1977) (declining to "adopt as a constitutional imperative, operative countrywide, that a State must disprove beyond a reasonable doubt every fact constituting any and all affirmative defenses related to the culpability of an accused"). Evidence of mere anger or hurt is not sufficient. *Talbott v. Commonwealth,* 968 S.W.2d 76, 85 (Ky. 1998). *See Sanborn v. Commonwealth*, 892 S.W.2d 542, 551 (Ky. 1994) (holding that it was not prejudicial error to refuse to allow the defense psychological expert to testify about a "triggering event" for which there was no independent evidence).

Because the statute does not define "extreme emotional disturbance," Kentucky law has considered a variety of situations concerning who is eligible to present this defense. By the time of Baze's trial, however, it was clear that the defendant had to point to a "triggering event," prompting a reaction that was so "enraged," "inflamed," or "disturbed" as to be uncontrollable, before he could present a defense under the theory.[2] *McClellan v. Commonwealth*, 715 S.W.2d 464, 468 (Ky. 1986); *Spears v. Commonwealth*, 30 S.W.3d 152, 155 (2001) . Baze may have been distraught at the on-going feud with his wife's family, but he could not point to a dramatic, isolated event in that conflict that could have caused him to lose temporary control of sense of right and wrong, thereby qualifying him for mitigation under a EED theory. *Ibid.* (stating that a "triggering event" is required). Therefore, limiting his ability to present evidence on this issue neither undermined the fundamental fairness of Baze's trial nor deprived him of any "weighty interest," and accordingly he cannot establish any grounds for habeas relief on this issue.

*Extreme Emotional Disturbance Instruction*

The same analysis undermines Baze's claim that the trial court improperly instructed the jury that it could consider the mitigation defense of extreme emotional disturbance (EED) only if it found that Officer Briscoe shot first in the final altercation with Baze. Baze claims that this qualifier rendered the instruction unconstitutional, but his argument does not survive scrutiny. "Extreme emotional disturbance is a *temporary* state of mind so enraged, inflamed, or disturbed as to overcome one's judgment, and to cause one to act uncontrollably from the impelling force of the extreme emotional disturbance rather than from evil or malicious purposes." *Garland v. Commonwealth*, 127 S.W.3d 529, 536 n.4 (Ky. 2003) (quoting *McClellan*, 715 S.W.2d at 468-69)

---

[2] *See* Eric Y. Drogin, *To the Brink of Insanity: "Extreme Emotional Disturbance" in Kentucky Law*, 26 N. Ky. L. Rev. 99 (1999).

(emphasis added). Kentucky law requires a "triggering event," that is responsible for causing the emotional disturbance. *Sanford v. Commonwealth*, 793 S.W.2d 112, 115 (Ky. 1990). A triggering event is dramatic, creating a *temporary* emotional disturbance that overwhelms the defendant's judgment, *ibid.*, such as the paradigmatic discovery of a spouse in bed with a lover. *See Spears,* 30 S.W.3d at 153, 155 (observing a tryst between wife and another man sufficient for "triggering event").

A triggering event is not synonymous with the common law concept of heat of passion, and may extend over a period of time, but its onset must be "sudden" and its effects "uninterrupted." *Springer v. Commonwealth*, 998 S.W.2d 439, 452 (Ky. 1999) (threat of child molestation could form basis for mother's EED defense, although the statement "festered for a time" in the defendant's mind). Baze had been in Ohio and Michigan in the immediate period preceding the killings, so even if we accept his assertions of fear of the police and aggravation from the family feud, the build-up of these factors, upon which Baze relies for his EED defense, was not uninterrupted. *Garland,* 127 S.W.3d at 536.

The dissent argues that "although Briscoe's actions did not constitute provocation in the textbook sense of the word, Kentucky law imposes no categorical limitation on the types of events that may trigger EED," relying on *McClellan v. Commonwealth* for support. (Dissent, p. 29). In a case decided after *McClellan*, but before the events of this case, the Kentucky Supreme court narrowed the circumstances which a defendant can offer as the basis for an EED defense and reiterated the requirement that "the event which triggers the explosion of violence on the part of the criminal defendant must be sudden and uninterrupted." *Foster v. Commonwealth*, 827 S.W.2d 670, 678 (Ky. 1991) (citing *McClellan* and other case law). The court explicitly stated that extreme emotional disturbance is "not a mental disease or illness." *Ibid.* (citing *Wellman v. Commonwealth,* 694 S.W.3d 696, 697 (Ky. 1985)). The court concluded: "[I]t is

wholly insufficient for the accused defendant to claim the defense of extreme emotional disturbance based on a gradual victimization from his or her environment, unless the additional proof of a triggering event is sufficiently shown." *Ibid.*

The dissent describes at length the efforts of the Highleys to induce the police to harass Baze, to accept the defendant's characterization. Briscoe's appearance at Baze's cabin therefore cannot be described as sudden or dramatic from Baze's point of view. Understanding that paranoia alone cannot substitute for a triggering event, the district court still allowed Baze to present an EED defense – if he could show something out of the ordinary occurred in his on-going relations with local law enforcement, namely that Briscoe shot first. Baze argued at trial both that Briscoe shot first and that Baze was put on edge by Briscoe reaching for his gun during his first trip to the cabin that day. The jury did not believe either story, but Baze received the opportunity to argue his version of events, as the Constitution requires.

*Juror Challenges*

Baze also attacks the seating of individual jurors, but he cannot point to any error, much less to one of constitutional magnitude.

As described above, a corrections officer sat on Baze's jury. Although empaneling law enforcement or corrections officers is far from optimal, no *per se* rule exists disqualifying them from jury service, unless state statute prohibits it, which is not the case in Kentucky. *United States v. Wood*, 299 U.S. 123 (1936) (holding that the Sixth Amendment does not disqualify government employees from jury service); *Woodall v. Commonwealth*, 63 S.W.3d 104, 118 (Ky. 2001) (holding that employment at the Kentucky State Prison did not disqualify a penalty-phase juror because "there is no authority for the proposition that mere knowledge about parole eligibility is a basis for challenge for cause"). In fact, at voir

dire, Baze's attorney stated that he had corrections officers on juries all the time. Therefore, this court has no basis on which to hold that the presence of a prison employee on the jury violated Baze's Sixth Amendment rights.

Baze argues in his brief that another juror, Larry Knipp, should have been excluded because his brother-in-law was, on occasion, Baze's jailer at the courthouse. Knipp indicated in the general voir dire that this relationship might influence his attitude toward Baze, a concern he withdrew in the individual interview. Since being a law enforcement officer is not a *per se* disqualification, then, logically, being a relative of one cannot mandate automatic exclusion. He apparently satisfied both the judge and counsel that his relationship would not cloud his ability to judge Baze fairly, so that Baze's right to a fair trial was not compromised. For the same reasons, the mere fact that an additional juror, James Padula, Jr., was friends with policemen did not warrant his exclusion from the jury, as Baze asserts. *McQueen*, 99 F.3d at 1319-20 (being friends with two of the police officers in the case did not disqualify a potential juror).

Valerie Utterback, another juror, had been personally touched by crime: her sister-in-law had been murdered eleven years before and she had two brothers serving time in prison. Baze asserts that she equated "justice" with the imposition of the death penalty, because, when asked about her sister-in-law's killing, she responded "I wanted to see justice done" and, in fact, the perpetrator was sentenced to death, although he died in prison. This reads a great deal into a stock response, especially given Utterback's assurances that she could be fair in assessing Baze's case. The judge found her explanation credible and nothing in the record would prompt this court to second guess that determination.

Baze asserts that he was forced to use two of his peremptory challenges to remove two jurors, Diana Lindsey and Noretta Bradt, from the panel, although he claims that they should have been excused for cause. The record does not

indicate that these two jurors were unqualified, but even if they were, Baze's contention would be without merit. Peremptory challenges are not a constitutional right, although the Supreme Court has held them to constitute an "essential part of trial by jury." *Lewis v. United States,* 146 U.S. 370, 376 (1892). It is not a constitutional violation, therefore, if a defendant has to use a peremptory strike to remove a juror who should have been removed for cause. *United States v. Martinez-Salazar,* 528 U.S. 304, 315-17 (2000).

Baze's contention that juror bias denied him his right to a fair trial is without merit.

*Imperfect Self Defense*

Baze claims that the trial court's refusal to give the jury an instruction on imperfect self-defense violated his constitutional rights. Challenging a jury instruction on collateral review is a difficult undertaking: only if "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process," can this court grant a writ. *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)). Far from infecting the process, the jury instructions were correct.

Baze wanted to argue that Deputy Briscoe reached for his own gun during his first visit to the cabin, thereby prompting Baze to fear for his life. Baze was willing to concede that this fear was irrational, but argued to the trial judge that the jury should be allowed to consider manslaughter, the result provided for under the Kentucky penal statute for a defendant who intentionally kills another in a reckless or wanton, but genuinely held, belief that he needed to act in self-defense. *Shannon v. Commonwealth*, 767 S.W.2d 548, 550 (Ky. 1988). The Kentucky Supreme Court decided that the record did not show that Briscoe had moved his hand toward his weapon on his initial visit, and therefore Baze did not have any reason, wanton or not, to fear for his life, making the trial court's ruling correct in disallowing the imperfect self-defense claim.

*Baze I*, 965 S.W.2d at 822. The testimony supports the factual determination that Briscoe did not reach for his gun during his first visit to the cabin on January 30, and therefore Baze has not shown any improper interpretation of the facts that would cast doubt on the fundamental fairness of his trial.

Furthermore, as the Kentucky Supreme Court carefully explained, the concept of imperfect self-defense does not exist under Kentucky law in the context of an arrest. The use of deadly force, whatever the perpetrator's state of mind, is not justifiable when "[t]he defendant is resisting an arrest by a peace officer." Ky. Rev. Stat. Ann. § 503.060(1) (1999). If the police are using "more force than is reasonably necessary to effect the arrest" then a suspect who resists arrest can validly claim he acted in self-defense. Ky. Rev. Stat. Ann. § 503.050 Kentucky Crime Commission Commentary (2003). In that scenario, however, the suspect has a perfect defense. Therefore, if Briscoe had shot at Baze first when Baze was unarmed and attempting to surrender, he would be entitled to an acquittal based on justified self-defense. The jury, in fact, received an instruction to that effect. However, the jury found implicitly that Baze initiated the gunfire, and so he falls under § 503.060(1), which precludes *any* claim of self-defense as justification for resisting arrest if the officer is using reasonable force. Therefore, this court has no grounds on which to grant habeas relief because, far from tainting the trial, the jury instructions were proper.

*Improper Jury Form*

The form that the jury received when deliberating on Baze's punishment incorrectly reflected the Kentucky law of the time: the form stated that the minimum punishment was life without possibility of parole for 25 years as opposed to the correct standard of 20 years before the possibility of parole. The form stated correctly that the jury could also opt for a life sentence. Baze claims that the incorrect verdict form given to the jury violated his due process rights. Had the mistake been the opposite, that is that the jurors were told that

their choice was between death and twenty years in prison, then Baze might have a constitutional claim. A jury might sentence a defendant to death if its members thought that the only alternative punishment for a double murder of police officers were a guaranteed twenty years in prison. It makes no sense to argue, however, that the jury would have chosen a *lesser* punishment (20 years) than the rejected, albeit incorrect, option available to it (25 years), especially since it also did not choose the life sentence.

Habeas petitioners must show that a trial error of constitutional dimension "had substantial or injurious effect" on the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). In this case, the jury chose death over two other options, including one that was stated more harshly than the actual law provided, demonstrating its determination that death was the appropriate penalty. *See also Schad v. Arizona*, 501 U.S. 624, 646-47 (1991) (explaining that the jury must be able to consider lesser included offenses to prevent it from being forced into an all-or-nothing choice between capital murder and innocence, which would diminish the reliability of a guilty verdict). The situation here meets the *Schad* requirement. Baze's jury could have sentenced him to life, a middle option between 20 (or 25) years in prison and death, but did not choose to do so. Therefore, the incorrect jury form did not have an injurious effect on the jury's verdict and habeas relief is not warranted.

*Admonition on Validity of the Ohio Arrest Warrant*

Baze claims that the trial judge's admonition regarding the legal irrelevance of Baze's belief that he was not wanted in Ohio violated his constitutional rights because a defendant has a right to explain why he acted as he did. Baze was able to testify that he shot the officers because he thought that they had no right to arrest him. It defies common sense to assert that anyone who thinks they are being falsely arrested has the right to use deadly force to thwart being taken into custody.

The trial judge was only acting responsibly in clarifying to the jury that "the law is that a person may be lawfully arrested by a law officer, without a warrant, upon reasonable information that the accused stands charged in the courts of another state . . . ." In essence, Baze was allowed to explain to the jury that he acted on an incorrect assumption of the law, but it is axiomatic that "ignorance of the law is no excuse." Therefore, the trial judge's admonition did not violate Baze's due process rights.

*Character Evidence*

The coroner testified at trial that neither Briscoe or Bennett were aggressive or "gung-ho" police officers. Baze complains that he was not allowed to rebut this assertion by introducing evidence that 1) Deputy Briscoe had once shot out the tires of a suspect in an effort to apprehend him; 2) when approaching the suspect, he stated "do you want to meet your Maker?"; and 3) Baze knew about the incident and therefore it colored his reaction to Briscoe's attempt to arrest him. The Kentucky Supreme Court ruled that Baze had failed to show that the incident was relevant to his claim of self-defense. *Baze I*, 965 S.W.2d at 824-25. Nothing in the record suggests that was an unreasonable conclusion that would implicate Baze's due process rights. In fact, the Commonwealth explained that Briscoe shot out the tires to stop the suspect from fleeing at 100 mph in a stolen car. Appellee Br. at 86. In this scenario, "do you want to meet your Maker?" is more an expression of admonition, along the lines of "are you crazy?" than a threat, rendering the statement irrelevant to Baze's self-defense claim. Given at least two plausible readings of the comment, the Kentucky Supreme Court did not deny Baze's due process rights by affirming the trial judge's evidentiary ruling.

*Identification of the Ohio Felony Charges*

Baze complains that informing the jury of the nature of the Ohio charges against him violated his constitutional right to a fair trial. He asserts that presenting the jury evidence of alleged previous violent acts "undoubtedly tipped the balance toward guilt during the jurors' three days of deliberation." Appellant Br. at 81. Although perhaps plausible speculation, Baze provides no citation to support his assertion that revealing the nature of the charges violated Kentucky's Rule of Evidence 401. The trial judge admonished the jury that the Ohio charge was not relevant to Baze's guilt in the killing of the two policemen. Nor does Baze offer any way around the fact that a federal court conducting habeas review may not, as a basic rule, revisit state court decisions. *Estelle, supra*; *Crane*, 476 U.S. at 690 (citing *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973)). The Kentucky Supreme Court found the issue to be without merit, *Baze I*, 965 S.W.2d at 821, and there the matter must rest.

*Mitigating Evidence: Baze's Federal Firearms Conviction*

Baze attempted to introduce evidence to the jury during the sentencing phase that he had received a 20-year sentence on a federal firearms charge, which would run consecutively to any prison sentence the jury would impose. At the time of sentencing, however, his firearms conviction was on appeal, and thus the trial judge refused to inform the jury about it because his sentence could be overturned. Baze's theory is that he could have avoided the death penalty if the jury concluded that the additional firearms conviction would ensure that he would never get out of prison. However, if the jury's "insurance sentence" were to be reduced or vacated, the jury would have determined his murder penalty on the basis of a false premise. Therefore, it was not entirely clear whether there was mitigation or not.

The dissent argues that Baze's Eighth Amendment rights were violated because "the jury had no way to directly

sentence him to life in prison for the tragic killings of the two officers." (Dissent, p. 38) The verdict form, however, allowed the jury to sentence Baze to any number of years they chose; to "confinement in the penitentiary for life;" to "confinement . . . without benefit of probation or parole until he has served a minimum of twenty-five years" or "death." We agree with the district court that, had the jury wished to spare Baze's life, yet keep him permanently behind bars, it could have done so by selecting the "confinement for life" option. Had the jury been skeptical that a life sentence would stick, it could have sentenced Baze to a three-digit term of years for each murder under its discretion to stipulate a specific prison sentence.

Kentucky juries are guided by detailed statutory guidelines as to aggravating and mitigating circumstances in deciding the penalty in a capital case. *Commonwealth v. Eldred*, 973 S.W.2d 43, 46 (1998). An independent sentence that might reassure a jury that the defendant will spend his natural life in prison is not on the list of mitigating circumstances that must be considered. KRS § 532.025(2)(b). The basic rules about restricting redundant and irrelevant evidence apply in capital sentencing hearings. *Skipper v. South Carolina*, 476 U.S. 1,4 (1986) (stating the "well-established" rule that a defendant has a right to introduce all *relevant* mitigating evidence). The jury had a direct way to keep Baze in prison for life; it was not error to withhold evidence of a potential, contingent, indirect, route to the same result. Fed. R. Evid. 403.

*Cumulation of Errors*

Baze argues in his brief that even if the eleven errors he asserts are considered to be harmless, their cumulative effect taints the trial to the extent that his due process rights were violated. This analysis fails, however, because Baze is unable to point to any individual errors in the trial, with the exception of the harmless error related to the jury form. Furthermore, Baze relies on *United States v. Parker*, 997 F.2d 219 (6th Cir. 1993), for the proposition that errors that are harmless in

isolation may require reversal when taken together. Under AEDPA, however, a court may only grant habeas relief based on misapplication of Supreme Court law. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). Because Baze cannot establish any errors to cumulate and because his theory that errors can be considered in the aggregate depends on non-Supreme Court precedent, this claim is also without merit.

## IV

For the foregoing reasons, we AFFIRM the district court's denial of Baze's petition for a writ of habeas corpus.

---

## CONCURRING IN PART, DISSENTING IN PART

---

R. GUY COLE, JR., Circuit Judge, concurring in part and dissenting in part. Because Baze admitted that he shot and killed Officers Bennett and Briscoe, his constitutional right to present a defense at trial pertaining to his mental state and mitigating evidence at sentencing were of the utmost importance. Although I agree with many of the majority's conclusions, I respectfully dissent as to my colleagues' conclusions on the EED defense at trial and the presentation of mitigating evidence at sentencing.

### A. Due Process Right to Present a Defense

At trial, Baze asserted that he believed Briscoe showed up at his residence to arrest him falsely and at the behest of the Highleys, who Baze claimed had repeatedly harassed him and previously used the police do so. In rejecting Briscoe's arrival as a possible trigger of EED, the majority asserts—without authority—that "[a] triggering event is shocking and dramatic, such as the paradigmatic discovery of a spouse in bed with a lover." This assertion, however, misapprehends Kentucky law at the time of the shootings. Although a discrete event must trigger the EED, that event need not be as shocking and dramatic as the majority suggests, it may overcome the defendant gradually, and it must be measured from the perspective of the defendant.

First, although Briscoe's actions did not constitute provocation in the textbook sense of the word, Kentucky law imposes no categorical limitation on the types of events that may trigger EED. As held by the Kentucky Supreme Court long before the shootings in our case, "a reasonable explanation of extreme emotional disturbance is not limited to specific acts of provocation by the victim but may relate to *any circumstance* that could reasonably cause an extreme

emotional disturbance." *McClellan v. Commonwealth*, 715 S.W.2d 464, 468 (Ky. 1986) (emphasis added). Indeed, the EED defense "is not restricted to circumstances which would constitute provocation in the ordinary meaning of the term . . . it is possible for any event, or even words, to arouse extreme mental or emotional disturbance." *Gall v. Commonwealth*, 607 S.W.2d 97, 108 - 09 (Ky. 1980), *overruled on other grounds*, *Payne v. Commonwealth*, 623 S.W.2d 867 (Ky. 1981).

Second, although the shootings did not instantaneously follow Briscoe's arrival, EED's "onset may be more gradual than the "flash point" normally associated with sudden heat of passion." *McClellan*, 715 S.W. at 468. So long as nothing interrupted the triggering event, Kentucky law recognizes that the EED remains viable.

Third—and most importantly in our case—Kentucky EED law measures whether the source of the defendant's alleged EED "is reasonable under the circumstances *as he believed them to be*." *McClellan*, 715 S.W.2d at 468 (emphasis added). That we (or most people, for that matter) would have perceived certain events differently does not mean that Baze's defense fails as a matter of law. To the contrary, the defense calls upon the jurors to "place themselves in the actor's position as he believed it to be at the time of the act." *Gall*, 607 S.W.2d at 108. In other words, the jury must have a chance to view Briscoe's arrival through Baze's eyes.

Evaluated through this time-honored legal framework, the availability of the EED defense to Baze becomes apparent, and the denial of it a clear violation of Baze's constitutional right to present a complete defense. The trial judge's unconstitutional denial of Baze's EED defense is based upon the: (1) improper restrictions on his right to present evidence; and (2) erroneous instructions to the jury.

Had he been allowed to present the relevant evidence available to him, Baze would have illustrated to the jury his

perception of the events on the day of the shooting—a perception that was critical to understanding the source of his claimed EED. Baze asserted that he saw Briscoe's arrival as the work of the Highleys, who had repeatedly harassed him in the months leading up to the shootings, including providing the police false accusations of criminal wrongdoing by Baze. But the trial judge limited evidence of the family feud to only to a general affirmation that it existed. Any time he asked a feud-related question, defense counsel was required by the court to instruct the witness to answer "[w]ithout going into any details...." Even when he did allow feud-related evidence—such as Baze's motivation for building a trap-door in his home—the trial judge admonished the defense to omit any discussion of the specific events that underlay the dispute.

No matter how many defense witnesses were able to utter the words "family feud," the most relevant and dramatic details—those involving the Highleys bringing the police into the fray to put Baze in danger of physical harm—were nowhere to be found. The jury was prevented from hearing evidence—including the testimony of a police officer—that on a prior occasion, the Highleys falsely told the police that Baze was driving drunk, had nearly run someone off the road, was armed and dangerous, and was a fugitive with out-of-state warrants. According to the excluded testimony, this false information from the Highleys led police officers to stop Baze's car, aim their guns at him, and threaten to shoot him if he moved. Further, both Baze and the police officer would have expressed their beliefs that it was the Highleys' allegations that instigated the stop. This testimony, in concrete terms, would have illustrated the link Baze perceived between the police and the Highleys, and why he therefore might have perceived Briscoe as an agent of the Highleys who could put Baze's life in danger. Instead, Baze was allowed to testify only in general terms to his suspicion that the Highleys had provoked this latest encounter with the police. Yet it is only when placed in the context of this prior showdown with the police that Baze's perception of the

events could become credible and its effect on his emotions reasonable.

Baze's prior experience with the police was relevant not only to show the general link in his mind between the Highleys harassment and police action, but also because one of the prior fabrications by the Highleys involved out-of-state warrants—the initial basis for Baze's arrest on the day of the shootings. During the previous Highley-instigated traffic stop, the officers had checked for out-of-state warrants and had told Baze that the law-enforcement computer disclosed no outstanding charges. This information would certainly have made Baze more likely to believe that his impending arrest on outstanding charges was a lawless act of familial score-settling rather than a legitimate exercise of police authority, and thereby contributed to the inflammation of his passions upon Briscoe's arrival. To the contrary, Baze was allowed to testify only to his general belief that there were no out-of-state warrants against him. Again, evidence that this information came from the same police department now seeking to arrest him would have bolstered the believability of Baze's perception and the reasonableness of the resulting distress.

The relationship in Baze's mind between the Highleys, the police, the impending arrest, and the threat of violence also interacted with another important contextual clue kept away from the jury: Baze's growing paranoia. Although a mere ongoing mental disturbance does not suffice to set forth a defense of EED, it was well-established by the Kentucky Supreme Court that "an underlying mental disease may be considered by a jury in making its determination of whether a defendant's explanation or excuse for his alleged 'extreme emotional disturbance' is reasonable under the circumstances as he believed them to be." *McClellan*, 715 S.W.2d at 468. The trial judge, however, prohibited the defense's psychiatric expert from testifying that the ongoing feud "was just feeding his paranoia. As it continued, [Baze] became more and more paranoid and more concerned about the safety of himself and

his family." This context would have further allowed the jury to assess how Baze might have interpreted the events on the day of the shooting and how these events produced a genuine fear for his well-being that produced severe distress.

The trial judge's rationale for the exclusion of this evidence—that the feud did not involve the murder victims—was expressly contradicted by the Kentucky Supreme Court well before Baze's trial took place. As noted above, in *McClellan*, 715 S.W.2d at 468, the court held that "a reasonable explanation of extreme emotional disturbance is not limited to specific acts of provocation by the victim but may relate to any circumstance that could reasonably cause an extreme emotional disturbance." Baze's EED defense depended on placing the officers' arrival in the context of the ongoing family feud and his relatives' prior use of the police to harass him. The proper question was whether the events, as Baze perceived them, reasonably placed him under severe emotional distress—not whether the victim "asked for it."

Finally, the trial judge excluded evidence that Baze might have understood Briscoe's presence at his home as a threat to his physical safety. Baze was prohibited from testifying about reading a newspaper article which reported that while making an arrest, Briscoe shot out the tires of the arrestee's car, pointed his weapon at the suspect, and asked him if he "want[ed] to meet [his] maker." Baze's testimony would have emphasized the danger that he felt during Briscoe's attempt to arrest him, and also would have provided the lens through which he interpreted Briscoe's subsequent actions.

The majority justifies the exclusion of this evidence by dwelling on details of Briscoe's prior incident that were unlikely to have been known to Baze. It first points out that "the Commonwealth explained that Briscoe shot out the tires to stop the suspect from fleeing at 100 mph in a stolen car." That may have been the case, but the majority does not explain how Baze would have learned of this. Similarly, the majority interprets "do you want to meet your maker?" as "an

expression of admonition, along the lines of 'are you crazy.'" Again, that may be one way of understanding such an interrogatory, but it is hardly the only one. The jury reasonably could have found that Baze was less prone than the majority to interpret Briscoe's question in this manner.

If the jury credited the above evidence, it could have concluded that when Briscoe arrived at his residence to arrest him, Baze believed: (1) that he was being falsely arrested; (2) because Briscoe was using his authority as a police officer to torment Baze at the Highleys behest; and (3) that the police generally, and Briscoe in particular, might turn violent when executing the arrest. A reasonable jury certainly could have determined that Baze reasonably felt extreme distress when confronted with these circumstances.

Even if the trial judge had admitted every piece of evidence that Baze proffered, the jury instructions themselves would have clearly trampled on Baze's constitutional right to present a complete defense. Following Baze's testimony, the trial judge told the jury that Baze's belief in the lawfulness of the attempted arrest was legally irrelevant. Yet this instruction misunderstood the EED defense, which requires the jury to measure the defendant's emotions as the defendant himself reasonably felt them. Baze's belief that there were no such charges would contribute to the "circumstances as he believed them to be," namely that Briscoe's arrival at his residence to arrest him was another instance of the police doing the Highleys bidding.

The trial judge instructed the jury that it could find that Baze acted under EED only if it found that Briscoe fired the first shot. In so doing, the trial judge prevented the jury from considering Baze's reaction—in light of his understanding of the circumstances—to Briscoe's arrival. The instruction also kept the jury from considering whether, Baze may have *believed* that Briscoe had fired or was about to fire.

Granted, under the common law "heat of passion" standard, the passage of several minutes between Briscoe's arrival and Baze's turn to violence would have exhausted any claims of EED. But because the Kentucky Supreme Court expressly contemplates that EED may percolate more gradually, a reasonable jury could have concluded that Briscoe's arrival—and all of the conclusions that Baze drew from it, given the circumstances as he understood them—was enough to inflame Baze's passion, even if it did not produce a split-second reaction. To use the majority's analogy, Briscoe's arrival may not have been analogous to Baze catching his wife in bed with a lover, but probably was analogous to, say, Baze observing his wife and another man check into a motel.

The majority argues that because Baze had previously been harassed by the police at the behest of the Highleys, "Briscoe's appearance at Baze's cabin therefore cannot be described as sudden or dramatic from Baze's point of view; if anything, it was routine and annoying." Under this logic, the majority would consider a husband's beating his wife for the second time to be merely "routine and annoying" because the victim should be used to it by now. Of course, the opposite is true: the first beating, or in this case the second instance of police harassment would reasonably make someone even more upset than the first instance. The second time, the victim knows that the first incident was not isolated. In any event, Briscoe's arrival would have been more disturbing to Baze than the prior incident of harassment, because this time his arrest was assured.

Even if Briscoe's arrival itself was not a triggering event under Kentucky law, an even more sudden and dramatic stimulus awaited Baze. Becky Baze testified that when her husband walked away from Briscoe, she saw Briscoe putting his hand near his holster. Believing that Briscoe was going to shoot her husband, Becky hollered and grabbed Briscoe's arm. Baze similarly testified that after he turned away from Briscoe, "everyone started hollering, 'Run!'" Again, given Baze's view of the circumstances—including both the prior

tense police incident initiated by the Highleys and the article he had read about Briscoe—Baze might have perceived his wife's outcry as a warning that Briscoe was about to turn violent towards him, and Baze in fact testified that he believed that Briscoe had tried to shoot him in the back. A reasonable jury could have found that a perceived imminent threat of violence at the hands of the police—which Baze believed was the product solely of the Highleys' vendetta against him—could reasonably and severely disturb an average person, let alone a paranoid one.

## B. *Mitigating Evidence*

The majority also errs in rejecting Baze's Eighth Amendment claim: that he was deprived of his right to present mitigating evidence by the exclusion of evidence about his pending twenty-year prison term on federal weapons charges. On the question of mitigating evidence, the Supreme Court has been resolute: "the sentencer may not refuse to consider or be precluded from considering *any relevant mitigating evidence*." *Skipper v. South Carolina*, 476 U.S. 1, 5, (1986) (emphasis added). This includes evidence "that the defendant would not pose a danger if spared (but incarcerated)." *Id.*

The majority contends that because this conviction was still pending on appeal, "it was not entirely clear whether there was mitigation or not." But this is precisely the type of inquiry that the Supreme Court has left for the jury, which could have been told about both the sentence and the appeal. And the possibility of an additional twenty-year sentence makes it less likely that Baze would ever return to the streets, and in any event would make him much older and presumably less dangerous if he did. Of course, Baze bore the risk that the jury would conclude that a not-yet-final sentence was too flimsy a basis upon which to assume Baze's additional incarceration. But the jurors also might have factored it into their calculus, given that an assessment of future dangerousness is inherently an uncertain and probabilistic

enterprise. *Cf. Johnson v. Texas*, 509 U.S. 350, 368 (1993) (upholding instructions to jury to consider whether there was "*a probability* that [the defendant] would commit criminal acts of violence that would constitute a continuing threat to society" (emphasis added)).

Recent cases from our sister circuits are particularly instructive in this regard. In *Paxton v. Ward*, 199 F.3d 1197, 1211 (10th Cir. 1999), the court reviewed the constitutionality of the state trial court's "refusal to admit a court order stating that [the defendant] had been cleared in his wife's death by a polygraph examination." The trial court had kept out the results because state law prohibited the admission of polygraph evidence due to concerns about its reliability. The court held that the refusal to admit this evidence constituted a clearly unreasonable application of the Supreme Court's Eighth Amendment jurisprudence, noting that whatever the reliability concerns that the use of a polygraph test might raise in a normal criminal proceeding "[t]he Supreme Court has been exceedingly cautious to ensure that a person found guilty of a capital offense is given every opportunity to present potentially mitigating evidence that might form the basis for a sentence less than death." *Id.* at 1214 (internal quotations omitted). The Ninth Circuit reached the same decision in an identical case—notwithstanding the state's concerns about the polygraph's reliability—noting that "under controlling United States Supreme Court authority, relaxed standards govern the admission of mitigating evidence during the penalty phase of a death penalty trial." *Rupe v. Wood*, 93 F.3d 1434, 1439 (9th Cir. 1996).

Although the trial court retains some discretion to exclude flagrantly unreliable or confusing evidence, this is not a case in which this discretion was called for. In *Alley v. Bell*, 307 F.3d 380 (6th Cir. 2002), we upheld the exclusion from the sentencing phase of a videotape of the defendant answering questions while under hypnosis. There, however, there was evidence in the record that "people can lie under hypnosis, and ... the hypnotic state produces different levels of

consciousness that can only be understood from a clinical perspective, not from a lay perspective." Unlike *Alley*—in which the evidence might affirmatively confuse all but the most technically informed—the mitigating evidence in this case requires no such expertise to consider. A lay person is perfectly capable of understanding that the conviction would not be final until after the appeal.

That Baze was facing an extra twenty years in prison was particularly relevant because the jury had no way to directly sentence him to life in prison for the tragic killings of the two officers. If the jury spared Baze's life, its next most restrictive option was to impose a sentence of twenty-five years to life. Finally, the trial judge excluded evidence that Baze might have understood Briscoe's presence at his home as a threat to his physical safety. Baze was prohibited from testifying about the newspaper article which reported that while making an arrest, Briscoe shot out the tires of the arrestee's car, pointed his weapon at the suspect, and asked him if he "wante[ed] to meet [his] maker." Baze's reading this would have added to the danger that he felt during Briscoe's attempt to arrest him, and also would have provided the lens through which he interpreted Briscoe's subsequent actions. The jury's perception of Baze's future dangerousness—and the chance that he could be back on the street sooner than it would want—may very well have motivated the jury to sentence him to death.

These shootings were brutal. But constitutional errors infected both Baze's conviction and sentence of death. Accordingly, I respectfully dissent.